UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

CHARLES C. GREEN,                                  :
                                                   :        Civil Action No.: 17 Civ. 6984 (AKH)
                              Plaintiff,            :
                                                   :
              - against -                           :
                                                   :
                                                   :
CHAD D. HARBACH,                                   :
                                                   :
                              Defendant.            :

------------------------------------------------------------- x


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**


Elizabeth A. McNamara
Adam Lazier
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York  10020
Telephone:  (212) 489-8230
Facsimile:   (212) 489-8340

*Attorney for Defendant Chad Harbach*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ........................................................................................ 1

FACTS ........................................................................................................................ 2

    A.    The Parties ............................................................................................ 2

    B.    The Two Works .................................................................................... 3

        1.    Harbach's Novel: *The Art of Fielding* .................................... 3

        2.    Plaintiff's Novel: *Bucky's 9th* ................................................ 5

        3.    The Complaint ........................................................................ 7

ARGUMENT ................................................................................................................ 8

I.    DISMISSAL IS REQUIRED WHERE THE PARTIES' WORKS ARE NOT
SUBSTANTIALLY SIMILAR .................................................................................. 8

    A.    Copyright Infringement Requires Substantial Similarity of Protectible
Expression and Cannot be Premised on Fact, Ideas, or Stock Elements ............... 9

    B.    The Court May Dismiss Plaintiff's Claim as a Matter of Law Without
Discovery Based on the Lack of Substantial Similarity of the Works ................. 12

II.    THE WORKS ARE COMPLETELY DISSIMILAR ....................................................... 14

    A.    The Plots of the Works are Not Similar ................................................... 15

    B.    The Characters in the Works are Not Similar ........................................... 24

    C.    The Settings of the Works are Not Similar ............................................... 27

    D.    The Themes of the Works Are Not Similar ............................................... 29

    E.    The Total Concept and Feel of the Works Are Not Similar .......................... 29

CONCLUSION ............................................................................................................. 32

4811-4484-4626v.9 3910089-000050

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*8th Wonder Entm't, LLC v. Viacom Int'l, Inc.*,
   2016 WL 6882832 (C.D. Cal. Nov. 22, 2016)........................................................31

*A Slice of Pie Prods., LLC v. Wayans Bros.*,
   487 F. Supp. 2d 41 (D. Conn. 2007)........................................................24

*Acker v. King*,
   46 F. Supp. 3d 168 (D. Conn. 2014)........................................................13

*Adsani v. Miller*,
   1996 WL 194326 (S.D.N.Y. Apr. 22, 1996)........................................................12

*Allen v. Scholastic, Inc.*,
   739 F. Supp. 2d 642 (S.D.N.Y. 2011)........................................................13, 14, 23, 25

*Arden v. Columbia Pictures Indus., Inc.*,
   908 F. Supp. 1248 (S.D.N.Y. 1995)........................................................31

*Arica Inst., Inc. v. Palmer*,
   970 F.2d 1067 (2d Cir. 1992)........................................................11, 30

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................12

*Beal v. Paramount Pictures*,
   806 F. Supp. 963 (N.D. Ga. 1992)........................................................11

*Berkic v. Crichton*,
   761 F.2d 1289 (9th Cir. 1985)........................................................22

*Blakeman v. Walt Disney Co.*,
   613 F. Supp. 2d 288 (E.D.N.Y. 2009)........................................................28, 29

*Boisson v. Banian, Ltd.*,
   273 F.3d 262 (2d Cir. 2001)........................................................30

*Brown v. Perdue*,
   2005 WL 1863673 (S.D.N.Y. Aug. 4, 2005),
   *aff'd*, 177 F. App'x 121 (2d Cir. 2006)........................................................13

*Castle Rock Entm't v. Carol Publ'g Grp.*,
   150 F.3d 132 (2d Cir. 1998)........................................................8, 9

*CBS Broad. v. ABC, Inc.*,
   2003 U.S. Dist. LEXIS 20258 (S.D.N.Y. Jan. 14, 2003) ......................................................30

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)......................................................................................................3

*Currin v. Arista Records, Inc.*,
   724 F. Supp. 2d 286 (D. Conn. 2010)......................................................................................22

*Dellar v. Samuel Goldwyn, Inc.*,
   150 F.2d 612 (2d Cir. 1945)........................................................................................................1

*Dickerson v. WB Studio Enters., Inc.*,
   2017 WL 3891696 (S.D.N.Y. Sept. 5, 2017)............................................................................31

*Dunn v. Brown*,
   2011 WL 4527449 (D. Mass. Sept. 26, 2011) ........................................................................13

*Dunn v. Brown*,
   517 F. Supp. 2d 541 (D. Mass. 2007) ......................................................................................24

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991)....................................................................................................................8

*Gal v. Viacom Int'l, Inc.*,
   403 F. Supp. 2d 294 (S.D.N.Y. 2005)......................................................................................12

*Gaste v. Kaiserman*,
   863 F.2d 1061 (2d Cir. 1988)....................................................................................................9

*Hallford v. Fox Entm't Grp., Inc.*,
   2013 WL 541370 (S.D.N.Y. Feb. 13, 2013).............................................................................14

*Hoehling v. Universal City Studios, Inc.*,
   618 F.2d 972 (2d Cir. 1980)....................................................................................................10

*Hogan v. DC Comics*,
   48 F. Supp. 2d 298 (S.D.N.Y. 1999)....................................................................................9, 24

*Jones v. CBS, Inc.*,
   733 F. Supp. 748 (S.D.N.Y. 1990)......................................................................................10, 29

*Jorgensen v. Epic/Sony*,
   351 F.3d 46 (2d Cir. 2003)........................................................................................................9

*Knitwaves, Inc. v. Lollytogs, Ltd.*,
   71 F.3d 996 (2d Cir. 1995).........................................................................................................9

4811-4484-4626v.9 3910089-000050

*Laureyssens v. Idea Grp., Inc.*,
    964 F.2d 131 (2d Cir. 1992)......................................................................................8

*Mallery v. NBC Universal, Inc.*,
    2007 WL 4258196 (S.D.N.Y. Dec. 3, 2007) ...................................................23, 24

*Marquardt v. King*,
    2011 WL 5042054 (N.D. Ga. Aug. 10, 2011) ........................................................13

*Metcalf v. Bochco*,
    294 F.3d 1069 (9th Cir. 2002) ...............................................................................31

*Nelson v. Grisham*,
    942 F. Supp. 649 (D.C. Cir. 1997).........................................................................13

*Nichols v. Universal Pictures Corp.*,
    45 F.2d 119 (2d Cir. 1930).....................................................................................10

*Nobile v. Watts*,
    2017 WL 4679464 (S.D.N.Y. Oct. 16, 2017) ............................................11, 13, 14

*Penguin Random House LLC v. Colting*,
    --- F. Supp. 3d ---, 2017 WL 3977000 (S.D.N.Y. Sept. 7, 2017) ...........................31

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010).....................................................................................12

*Polsby v. St. Martin's Press, Inc.*,
    8 F. App'x 90 (2d Cir. 2001) ..................................................................................12

*Repp v. Webber*,
    132 F.3d 882 (2d Cir. 1997)..................................................................................8, 9

*Reyher v. Children's Television Workshop*,
    533 F.2d 87 (2d Cir. 1976).......................................................................10, 11, 23, 29

*Rice v. Fox Broad. Co.*,
    330 F.3d 1170 (9th Cir. 2003) ...............................................................................31

*Scott v. Meyer*,
    2010 WL 2569286 (C.D. Cal. June 21, 2010) ........................................................14

*Sheldon Abend Revocable Trust v. Spielberg*,
    748 F. Supp. 2d 200 (S.D.N.Y. 2010).................................................................23, 24

*Starobin v. King*,
    137 F. Supp. 2d 93 (N.D.N.Y. 2001)......................................................................11

iv

*Walker v. Time Life Films, Inc.*,
    784 F.2d 44 (2d Cir. 1986)..................................................................................10, 13, 24

*Warner Bros. v. American Broad. Cos.*,
    720 F.2d 231 (2d Cir. 1983)...........................................................................................3, 12

*Webb v. Stallone*,
    910 F. Supp. 2d 681 (S.D.N.Y. 2012)................................................................................10

*Williams v. A&E Television Networks*,
    122 F. Supp. 3d 157 (S.D.N.Y. 2015)...............................................................................30

*Williams v. Crichton*,
    84 F.3d 581 (2d Cir. 1996).......................................................................................... *passim*

**Statutes**

17 U.S.C. § 505 .....................................................................................................................1

**Rules**

Federal Rules of Civil Procedure 12(b)(6)........................................................... *passim*

**Other Authorities**

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 13.03[A][1] ........................11

4811-4484-4626v.9 3910089-000050

Defendant Chad Harbach ("Harbach") hereby submits this memorandum of law in support of his motion pursuant to Fed. R. Civ. P. 12(b)(6) for an order dismissing the Complaint, Dkt. 1 ("Compl."), and awarding him his attorneys' fees and costs pursuant to 17 U.S.C. § 505.

## PRELIMINARY STATEMENT

This lawsuit is a classic example of "that obsessive conviction, so frequent among authors . . . that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism." *Dellar v. Samuel Goldwyn, Inc.*, 150 F.2d 612, 613 (2d Cir. 1945) (per curiam). Years after its initial publication in 2011, Plaintiff only now brings this action insisting that Harbach's acclaimed and successful novel, *The Art of Fielding*, infringes the copyright in his unpublished novel, *Bucky's 9th*. But Plaintiff's own allegations reveal that the two works have little in common beyond broad unprotectible ideas (*e.g.*, an underdog college baseball team overcoming the odds to achieve success) and a list of incidental, cherry-picked "random duplications" that are often misleading and consistently wrenched out of context. Compl. ¶ 23; App. at 6.

Even a cursory review of the works confirms that, apart from isolated generic elements, the two works are strikingly dissimilar—from the plots to the settings to the themes to the characters. *Bucky's 9th* is a 155-page story of a "ringer" who impersonates a deaf person for a few short weeks to save the baseball team at an east coast college for the deaf, and solve the mystery of his famous father's suicide. *The Art of Fielding* is a 512-page novel that takes place over more than three years, describing the rise, fall, and coming of age of a baseball prodigy and those around him at a small liberal arts college on the shores of Lake Michigan. The work is a richly woven tapestry, bringing together multiple plot lines involving the college president's surprising love affair with the prodigy's gay intellectual roommate, his daughter's return home after marrying a much older lover in California, and her affair with the prodigy's teammate and

mentor.  None of those storylines, or central characters, bears any resemblance to *Bucky's 9th*.
From these two dramatically different works, Plaintiff extracts a random list of abstract and
imagined "similarities" to attempt to construct a copyright claim.

The Copyright Act does not protect the abstract ideas and stock elements (so-called
"*scenes à faire*") that necessarily flow from such ideas or settings as those pressed here.  Only a
finding of "substantial similarity" of *copyrightable* expression contained within the two works,
when compared and each viewed as a whole, can support an infringement claim.  Yet, Plaintiff's
Complaint rests on perceived shared, abstract ideas; *not* expression.  Indeed, Plaintiff concedes
that the two books "share certain conventions that are common to sports narratives, such as the
tale of a perennial and disadvantaged underdog which defeats its long-superior rivals and is led
by a talented, but troubled, prodigy."  Compl. ¶ 23.

In the end, Plaintiff believes that any random similarity between the works isolated from
the expressive context in which it appears could only come from infringement.  But in case after
case, on pre-discovery motions like this one, courts in the Second Circuit have no trouble
disposing of claims similar to Plaintiff's where the *only* similarities between two works are
abstract ideas and stock elements that naturally flow from the idea.  Since the total lack of
similarity of protected expression may be readily determined as a matter of law, this Court
should dismiss the Complaint with prejudice pursuant to Rule 12(b)(6), and award Harbach his
attorneys' fees as prevailing party.

## FACTS

### A.     The Parties

Plaintiff Green resides in Dallas, Texas, and is the author of *Bucky's 9th*. Compl. ¶ 5.

Defendant Harbach resides in Charlottesville, Virginia, and is the author of *The Art of
Fielding*.  Compl. ¶ 6.  As the Complaint acknowledges, *The Art of Fielding* was first published

2

in 2011 and is a "highly acclaimed work," described as "one of the best baseball novels ever." *Id.* ¶ 2 & n.2.

**B.    The Two Works**

Since "a determination of substantial similarity requires a detailed examination of the works themselves," *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir. 1996) (citation and internal quotation marks omitted), a summary of each of the works at issue follows.[1]

### 1.    Harbach's Novel: *The Art of Fielding*

This claim arises out of Harbach's critically acclaimed novel *The Art of Fielding*.  The novel tells the story of five central characters at Westish College, a "small, venerable, but . . . slightly decrepit liberal arts college on the western shore of Lake Michigan" in Wisconsin. McNamara Decl., Ex. A at 50-51.

*The Art of Fielding* begins with Mike Schwartz, a rising sophomore on the Westish baseball team, meeting Henry Skrimshander at a summer tournament game.  Since childhood, the book explains, Henry had been focused on becoming the perfect shortstop, inspired by *The Art of Fielding*, a manual-cum-philosophical treatise about the position written by his idol. Astonished by Henry's "transcendent talent," Mike befriends him and arranges for him to come to Westish.  As Henry, the son of a blue-collar family from South Dakota, slowly settles into campus life, he develops a deep bond with Mike.  Mike drives him to train relentlessly, and Henry quickly stands out on Westish's baseball team.

---

[1] So as to provide the Court with the opportunity to review the works in their entirety, as the law requires, copies of *The Art of Fielding* and *Bucky's 9th* have been filed with the Court as Exhibits A and B respectively to the moving Declaration of Elizabeth A. McNamara ("McNamara Decl.").  *See Warner Bros. v. American Broad. Cos.*, 720 F.2d 231, 240-41 (2d Cir. 1983) (substantial similarity requires review of the two works at issue).  On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), this Court may review the works themselves and any documents on which the plaintiff relied in drafting the complaint.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  The two works are properly considered on this motion because the works are central to Plaintiff's claim and are both repeatedly referenced in the Complaint.

By Henry's junior year, Westish's baseball team, which "had been crappy for too many years to count," *id.* at 11, begins to win, and Henry becomes "something Westish had never seen: a *prospect*." *Id.* at 49.  On the verge of tying the college record for most consecutive error-free games, a routine throw slips away from Henry and sails into the Westish dugout, injuring his teammate Owen Dunne.  Wracked by self-doubt, Henry loses the ability to make the most basic throws.  He eventually leaves the baseball team and sinks into a deep depression.

As Henry struggles to regain his form, Mike finds himself adrift as his graduation approaches.  Rejected by every law school he applied to and dependent on pain killers to treat knee pain caused by a lifetime of sports, he resents Henry for his natural talent, and wonders whether he made a mistake helping Henry at the expense of his own future.  He begins dating Pella Affenlight, the daughter of Westish College president Guert Affenlight, who has returned to campus in an effort to reconnect with her father and rebuild her life after leaving her husband.  And Guert Affenlight, much to his surprise after years of heterosexual affairs, falls madly in love with Henry's friend and teammate, Owen, a charming intellectual.  They begin a furtive affair complicated by their administrator-student relationship, a forty-year age difference, and Guert's own questions about his sexual identity.

Even in Henry's absence, the players he has mentored on the baseball team continue to flourish.  On the eve of the national championship game, the chair of Westish's board of trustees and its dean of students tell Guert Affenlight that they know about his affair with Owen.  They give him a choice: resign at the end of the academic year or face exposure.  Guert, who had begun looking forward to a future at Westish with Pella and even Owen, reluctantly agrees to resign.  At Guert's insistence, Henry flies to South Carolina for the championship game.  He enters the game in the bottom of the ninth as a pinch hitter, and, after being hit by a pitch, scores

4

the winning run.  But the team's victory is tempered by the news that Guert Affenlight has died of a heart attack.

Pella spends the rest of the summer brooding over her father's death, and she eventually decides that her father's final resting place should be in the lake he loved.  She, Henry, Mike, and Owen reunite to exhume Guert's body and move it to the lake.  After the others leave, Mike and Henry discuss their futures.  Mike has accepted a job to return to Westish as an assistant coach, and Henry has been drafted by the St. Louis Cardinals.  Henry tells Mike that, instead of signing a professional contract, he wants to return to Westish for his senior year and assume Mike's role of team captain.  Recognizing that he may no longer be the team's star, he offers to do whatever it takes to fit in.  Mike agrees, and he and Henry resume training.

### 2.  Plaintiff's Novel: *Bucky's 9th*

*Bucky's 9th* is about Kenesaw "Bucky" Bucks, son of former NFL quarterback Orville Bucks and former star pitcher for the Princeton baseball team.  Bucky's background is revealed through flashbacks spread through the book.  What emerges is that Willie Chance, his father's teammate and friend, spent five years in prison in connection with a game-fixing scandal.  On the day Willie was released from prison, his father committed suicide.  He left Bucky a letter saying that he had also been involved in Willie's crimes, and that he had leaked information about Willie's involvement in return for money to cover his gambling debts.  Bucky discovered his father's dead body, and rearranged it to make it look like an accident.  These events led him to drop out of Princeton and wander the country.

The novel opens about three years later, with Bucky living in squalid conditions in Philadelphia.  He re-unites with Willie, his father's partner in the game-fixing scandal, at a carnival.  Bucky learns that Willie is now improbably (given his criminal history involving cheating) a baseball coach at nearby Hill College for the Deaf.  Hill College is threatening to shut

5

down its underachieving baseball program unless it wins a championship, and Willie proposes that Bucky pretend to be deaf and come play at Hill College to save the team.  Bucky agrees, hoping to find out the truth about his father's involvement in Willie's crimes.

After assuming the identity of a deaf person from Texas named Harold LaMar and learning some rudimentary American Sign Language, Bucky arrives at Hill College and joins the team.  He plays shortstop, in order to avoid being recognized from his days at Princeton.  Bucky immediately becomes Hill College's star player, and with him in the lineup the team begins to challenge for the league title.

Much of the book's plot involves Bucky trying to conceal the fact he is not deaf.  Not only are his teammates suspicious, but biology professor Robert Goodnight – who has been promised a new laboratory if the baseball team is eliminated – begins to investigate him.  And Bucky falls for Julie Ross, Hill College's twenty-four year-old assistant dean of students, but their relationship is threatened by the fact that Bucky must conceal from Julie his real identity, and the fact he is not deaf.

Shortly before the championship game, Bucky finally talks to Willie about his father.  Willie confirms that Bucky's father was involved in the game-fixing scheme and probably leaked the story that led to Willie's imprisonment.  Willie tells Bucky that he can make it up to him by helping Hill College win the championship.  Meanwhile, however, Julie and Professor Goodnight discover Bucky's real identity.  While Julie is crushed, Professor Goodnight threatens to expose the deception to the media unless Bucky agrees to "throw" the game.

Instead of going to the stadium on the day of the championship, Bucky goes to Julie's apartment, where he reconciles with her.  He does not arrive at the game until the ninth inning, with Hill College trailing by one run.  Willie calls on Bucky to pinch hit with two outs and a

4811-4484-4626v.9 3910089-000050

runner on first base.  As Bucky steps up to the plate, he realizes that he has finally made peace with his father's legacy.  He gets hit by a pitch and reaches first base, but Hill College loses the game.

The baseball team is nonetheless saved by a donation from a wealthy alumnus.  When Professor Goodnight tells the college president about Willie's deception, she promises a quiet investigation but seems unperturbed, and does not believe authorities will bother pursuing Goodnight's allegation that Willie misappropriated federal financial aid intended for deaf students.  The book concludes with a short epilogue set a few years after the rest of the book's events, showing that Bucky and Julie are still together, and have children.

### 3. The Complaint

Plaintiff claims that *The Art of Fielding* is a "large-scale misappropriation of [his] creative efforts."  Compl. ¶ 2.[2]  However, he asserts no allegations that evidence any taking of actual expression; nor does he allege anything that even approaches close paraphrasing.  Instead, Plaintiff's action rests on a list of purported similarities in plot points between Plaintiff's work and *The Art of Fielding* set out in paragraphs 23 through 33 of the Complaint, and a twenty-five page Appendix to the Complaint.  Notably, Plaintiff admits that some of the alleged similarities are nothing more than "conventions that are common to sports narratives," Compl. ¶ 23, and others amount to "random duplications."  Compl. App. at 6.[3]  Nonetheless, the Complaint

---

[2] Harbach's alleged "access" to Plaintiff's unpublished work is based on rank speculation.  Plaintiff does not allege that he ever sent *Bucky's 9th* to Harbach, and pleads no other facts to support Harbach's access to it aside from speculation that Harbach may have had access to an "earlier version[]" of *Bucky's* that he had distributed to literary agencies because "Harbach was well connected in literary circles."  Compl. ¶ 3.  Should this action proceed beyond this motion to dismiss, evidence will show that Harbach never received a copy of Plaintiff's work; nor was he otherwise aware of it, and it most certainly played no role in the creation of *The Art of Fielding*.

[3] Plaintiff goes even further and admits that "[i]t is a given that there are only so many ways to write a sports story, a coming-of-age story, or a college story.  Put the three together and overlap becomes probable . . . . The common ground on which [the two works] both open is plausibly a function of genre, sports-story convention, and the realities of college life and of baseball.  Compl. App. at 1.

focuses on such alleged similarities as both works involving an underdog baseball team achieving unprecedented success, both ending with a climactic baseball game in which the main character is hit by a pitch at a critical juncture, and both novels taking place at liberal-arts colleges.  Based on these abstract and incidental similarities, Plaintiff brings a claim of copyright infringement and seeks injunctive relief against Harbach.  Compl. ¶¶ 40-44.

## ARGUMENT

## I.   DISMISSAL IS REQUIRED WHERE THE PARTIES' WORKS ARE NOT SUBSTANTIALLY SIMILAR

This motion turns on a single issue:  a lack of substantial similarity of protected expression between *Bucky's 9th* and *The Art of Fielding*.  The application of well-settled Second Circuit law dictates the dismissal of this action.  By simply reviewing the respective works – which is routinely done on an upfront motion – it is evident that any similarity that exists is entirely superficial, constructed out of nothing more than abstract ideas and the stock elements that necessarily flow from such ideas.  Plaintiff's list of random, generic, and out-of-context similarities cannot substitute for the comparison of the actual works, which reveals that the actual expression of the two novels does not begin to approach being "substantially similar."

"Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying."  *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  As the Second Circuit has explained, "[t]here are two main components of [a] *prima facie* case of infringement:  'a plaintiff must first show that his work was actually copied . . . [and] then must show that the copying amounts to an improper or unlawful appropriation.'"  *Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 139-40 (2d Cir. 1992)).  In the absence of direct evidence of copying, a copyright plaintiff must first allege facts

8

to show that defendant had "a reasonable possibility of access" to the preexisting work and that there are similarities in the allegedly infringing work that are probative of copying. *Jorgensen v. Epic/Sony*, 351 F.3d 46, 54 (2d Cir. 2003); *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988). "'It is only *after* actual copying is established that one claiming infringement' then proceeds to demonstrate that the copying was improper or unlawful by showing that the second work bears 'substantial similarity' to *protected expression* in the earlier work." *Castle Rock Entm't*, 150 F.3d at 137 (quoting *Repp*, 132 F.3d at 889) (emphasis added).

Even assuming solely for purposes of this motion that Plaintiff's allegations of Harbach's purported access to *Bucky's 9th* are sufficient and that there are enough similarities between the two novels to be probative of copying,  Plaintiff's copyright claim fails because a back-to-back review of the works reveals that they are not substantially similar in their protected expression.

### A.    Copyright Infringement Requires Substantial Similarity of Protectible Expression and Cannot be Premised on Fact, Ideas, or Stock Elements

In determining whether two works are substantially similar, courts in this Circuit apply the "ordinary observer test," asking "whether a lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590.  Critically, where, as here, the works in question contain both protectible and unprotectible elements, the court must apply a "discerning ordinary observer test," *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 309 (S.D.N.Y. 1999), "we must take care to inquire only whether 'the *protectible elements, standing alone*, are substantially similar.'" *Williams*, 84 F.3d at 588 (quoting *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)).  In performing its gatekeeper function, there are several fundamental principles which the Court must apply.

First, "[i]t is a principle fundamental to copyright law that a copyright does not protect an idea, but only the expression of an idea." *Williams*, 84 F.3d at 587 (internal quotations and

citations omitted).  "It has long been recognized that all fictional plots, when abstracted to a

sufficient level of generality, can be described as similar to other plots."  *Jones v. CBS, Inc.*,

733 F. Supp. 748, 753 (S.D.N.Y. 1990).  As Judge Learned Hand explained:

> Upon any work . . . a great number of patterns of increasing
> generality will fit equally well, as more and more of the incident is
> let out . . . [T]here is a point in this series of abstractions where
> they are no longer protected, since otherwise the [author] could
> prevent the use of his 'ideas,' to which, apart from their
> expression, his property is never extended.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930).

Second, the Second Circuit has repeatedly held that stock scenes and stock themes, often

termed *scenes à faire*, cannot form the basis of a copyright claim.  These are defined as

"incidents, characters or settings which are as a practical matter indispensable, or at least

standard, in the treatment of a given topic," *Hoehling v. Universal City Studios, Inc.*, 618 F.2d

972, 979 (2d Cir. 1980), or as "thematic concepts . . . which necessarily must follow from certain

plot situations."  *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976).  In a

police story set in the Bronx, for example, "[e]lements such as drunks, prostitutes, vermin and

derelict cars" as well as "[f]oot chases[,] . . . the morale problems of policemen . . . [and] the

Irish cop" were unprotectible *scenes à faire* or stock elements.  *Walker v. Time Life Films, Inc.*,

784 F.2d 44, 50 (2d Cir. 1986).[4]

Third, mere lists of purported random "similarities" isolated from the context in which

they appear, like what Plaintiff has provided in his Complaint, are "inherently subjective and

unreliable," particularly where "the list emphasizes random similarities scattered throughout the

---

[4] *See also Hoehling*, 618 F.2d at 979 (revelry in German beer hall, common greetings of that time such as "Heil Hitler" and songs such as German national anthem were *scenes à faire* in works about *Hindenburg* airship); *Webb v. Stallone*, 910 F. Supp. 2d 681, 688-89 (S.D.N.Y. 2012) (finding the following similarities to be classic *scenes à faire* in action plots: "use of the heroine as a human shield in the accomplice's escape; strategic planting of explosives by mercenaries in key strategic positions before the coup begins; an attempted ambush by regime forces against the mercenaries; and a climactic gun battle with sequenced explosions including detonation of a fuel repository to create a 'reverse ambush'. . .").

works." *Williams*, 84 F.3d at 590; *see also Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1073 (2d

Cir. 1992) (70-page appendix of purported similarities insufficient to establish substantial

similarity); *Nobile v. Watts*, 2017 WL 4679464, at *5-8 (S.D.N.Y. Oct. 16, 2017) (dismissing

copyright infringement suit regarding M.L. Stedman's novel *The Light Between the Oceans*

notwithstanding plaintiff's identification of twenty-two different similarities); *Starobin v. King*,

137 F. Supp. 2d 93 (N.D.N.Y. 2001) (dismissal of copyright lawsuit regarding Stephen King's

book *Desperation* based on a 16-page list of non-contextual incidental similarities); *Beal v.*

*Paramount Pictures*, 806 F. Supp. 963, 967 & n.2 (N.D. Ga. 1992) (noting lists of similarities are

"inherently subjective and unreliable" since "[m]any such similarities could be found in

dissimilar works").  Indeed, part of Plaintiff's list is explicitly titled "stand-alone oddities" or

"clustered oddities" that highlight random and abstract events.  Compl. Addendum A & B.

     In recognition of the necessarily close parallels in abstract ideas and literary conventions

in many works of creative fiction, the standard for establishing substantial similarity is a

demanding one.  A copyright plaintiff must demonstrate that the defendant has "appropriated the

'fundamental essence or structure' of plaintiff's work."  *Arica Inst.*, 970 F.2d at 1073 (quoting 4

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 13.03[A][1] at 13-27 (defining

"comprehensive nonliteral similarity")).  Moreover, "the essence of infringement lies in taking

not a general theme but its particular expression through similarities of treatment, details, scenes,

events and characterization."  *Reyher*, 533 F.2d at 91.  The works must share similarities in "such

aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting."

*Williams*, 84 F.3d at 588.  While differences alone may not excuse actual infringement, "the

Second Circuit has observed that 'numerous differences tend to undercut substantial similarity.'"

*Adsani v. Miller*, 1996 WL 194326, at *3 (S.D.N.Y. Apr. 22, 1996) (quoting *Warner Bros.*, 720 F.2d at 241).

> **B.     The Court May Dismiss Plaintiff's Claim as a Matter of Law Without Discovery Based on the Lack of Substantial Similarity of the Works**

Courts routinely dismiss meritless copyright infringement claims like Plaintiff's on pre-discovery motions under Rule 12(b)(6) where, as here, the alleged similarity "concerns only noncopyrightable elements of plaintiff's work or no reasonable trier of fact could find the works substantially similar." *Williams*, 84 F.2d at 587 (citation and quotation marks omitted).  The Second Circuit has explained that where the works in question are incorporated into a plaintiff's complaint, "it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010).  If the court determines that the two works are not substantially similar as a matter of law, the court "can properly conclude that the plaintiff's complaint, together with the works incorporated therein, do not plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)); *see also Gal v. Viacom Int'l, Inc.*, 403 F. Supp. 2d 294, 305 (S.D.N.Y. 2005) ("[T]here is ample authority for the proposition that a district court may make [a determination as to substantial similarity] on a motion to dismiss for failure to state a claim under Rule 12(b)(6)." (citing cases)).

Because dismissal on the pleadings is based on an ordinary observer's comparison of the actual works, discovery is not necessary.  *See Peter F. Gaito*, 602 F.3d at 64 (no discovery necessary because "what is required is only a . . . comparison of the works"); *Polsby v. St. Martin's Press, Inc.*, 8 F. App'x 90, 92 (2d Cir. 2001) (discovery "not necessary for a comparison of the works in order to assess whether, as to the protectible elements, they were

substantially similar"). "[I]n any case involving substantial similarity, the actual texts are the relevant evidence." *Nelson v. Grisham*, 942 F. Supp. 649, 652 (D.C. Cir. 1997) (citing *Walker*, 784 F.2d at 51). "[T]he works themselves, not descriptions or impressions of them, are the real test for claims of infringement." *Walker*, 784 F.2d at 51.

Unsurprisingly, bestselling authors are common targets for baseless copyright claims in which plaintiffs contend that their successful books were somehow derived from plaintiffs' works. And in case after case, these claims are dismissed because no similarity exists beyond abstract ideas, facts or random words or phrases – much less the substantial similarity that the law requires. *See, e.g.*, *Nobile*, 2017 WL 4679464 (dismissal of copyright action arising out of the best-selling novel *The Light Between the Oceans* where there was no substantial similarity between novel's setting, characters, theme, plot, sequence, pace and total concept and feel and plaintiff's work); *Marquardt v. King*, 2011 WL 5042054 (N.D. Ga. Aug. 10, 2011) (dismissal of copyright action claiming Stephen King's novel *Duma King* copied character who could paint due to contact with a supernatural being, and bad things happens to those who come in contact with paintings, and other incidental similarities);[5] *Brown v. Perdue*, 2005 WL 1863673, at *9, 13 (S.D.N.Y. Aug. 4, 2005), *aff'd*, 177 F. App'x 121 (2d Cir. 2006) (dismissal of copyright action against author and publisher of *The Da Vinci Code* arising out of another thriller that "incorporates religious themes, as well as ideas and themes that "find their origin in historical facts, events and figures, as well as pre-existing works"); *Allen v. Scholastic, Inc.*, 739 F. Supp. 2d 642 (S.D.N.Y. 2011) (dismissal of copyright claim arising out of *Harry Potter and the Goblet*

---

[5] Indeed, successful authors like Stephen King or Dan Brown even face more than one unfounded copyright action. *See, e.g.*, *Acker v. King*, 46 F. Supp. 3d 168, 175 (D. Conn. 2014) (dismissal of copyright action arising out of Stephen King's novel *Doctor Sleep*, where plaintiff's allegations were limited to unprotectible elements); *Dunn v. Brown*, 2011 WL 4527449 (D. Mass. Sept. 26, 2011) (dismissal of copyright action arising out of Dan Brown's novel, *Angels and Demons*, where plaintiff's allegations were limited to stock scenes, abstract ideas and random textual similarities, with an award of attorneys' fees to defendants).

*of Fire* where plaintiff alleged that both works featured a young male protagonist, involved secret wizarding communities, wizarding schools, and wizard competitions); *Scott v. Meyer*, 2010 WL 2569286 (C.D. Cal. June 21, 2010) (dismissal of copyright claim against author and publisher of *Twilight* series arising out of plaintiff's vampire work, with an award of costs and attorneys' fees).

Here, by simply reading Plaintiff's work and comparing it with *The Art of Fielding* – after stripping both works of their abstract ideas and stock elements – only one conclusion can reasonably be reached:  there is no similarity between the protectible elements of the works and Plaintiff's claims of copyright infringement must be rejected.

## II.     THE WORKS ARE COMPLETELY DISSIMILAR

*Bucky's 9th* and *The Art of Fielding* are not remotely similar.  Plaintiff's Complaint strains to conjure similarities between the two works where none exist, including creating a list, a table, and an Appendix of random alleged "similarities" isolated from the context in which they appear and often misrepresented.  *See* Compl. ¶¶ 23-33, App.  Courts in the Second Circuit however, have rejected this "scattershot approach" time and again, "because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another."  *Williams*, 84 F.3d at 590; *see also Nobile*, 2017 WL 4679464, at *4; *Hallford v. Fox Entm't Grp., Inc.*, 2013 WL 541370, at *5 (S.D.N.Y. Feb. 13, 2013); *Allen*, 739 F. Supp. 2d at 663 n.157.

In reality, any similarities between the works exist only at the most general level, constituting ideas rather than protectible expression, and thus cannot support a copyright infringement claim.  An analysis of the actual works – instead of extracted random similarities – demonstrates that the works are readily distinct in terms of their plot, characters, settings, themes, and total concept and feel.  Thus, Plaintiff's copyright claim fails as a matter of law.

14

### A.     The Plots of the Works are Not Similar

Frequently, in copyright lawsuits over literary works, plot elements "that appear similar in their abstract description prove to be quite dissimilar once examined in any detail." *Williams*, 84 F.3d at 590.  This is clearly the case here.  Thus, Plaintiff's Complaint asserts that the books are each "anchored by four core narratives: (1) the Baseball Prodigy-Comes-of-Age-Plot; (2) the Recruiter-Mentor Plot; (3) the Illicit-Romance Plot; and (4) the Intergenerational Plot."  Compl. ¶ 25.  However, when one goes beyond this superficial level of abstracted ideas, any similarity between the actual plots of the works dissolves.

*Bucky's 9th* is, at bottom, a story of two things: Bucky's struggle to make peace with his father's legacy, and his attempt to impersonate a deaf person in order to help Hill College win a championship and save the team.  With the exception of flashbacks and the brief epilogue, the entire work takes place over a few weeks.  *See* McNamara Decl., Ex. B at 134.  Bucky spends most of that time trying to carry on his impersonation of a deaf person in order to ensure that his teammates, his girlfriend Julie, and Professor Goodnight do not discover his secret.  During his brief time at Hill College, Bucky solves the mystery of his father's suicide, makes things right with Willie, falls in love with Julie, foils Professor Goodnight's plot to destroy the Hill College baseball program, and leads his team to the championship game.

The *Art of Fielding* is, in contrast, a much broader story that follows five central characters as they navigate months or years at Westish College.  When we meet Henry, he is a short, skinny boy with a passion for baseball who has just graduated from high school, harboring no illusions that he would be a college player.  When Mike engineers his admission to Westish, we follow Henry's painstaking training that, together with his natural talent, transforms him into a professional prospect.  Henry's crumbling baseball career after the errant throw that knocks out Owen causes Henry and Mike to face self-doubt and struggle to chart their futures away from

Westish and away from each other.  Meanwhile, President Guert Affenlight must accept his estranged daughter back into life, figure out how he has fallen into a forbidden relationship with a male student, and reassess his plans for spending the rest of his career at the college he loves. And, finally, Pella must rebuild her life after her divorce in a world she thought she had left behind and then come to terms with her father's true passions and his death.

Plaintiff all but ignores the inescapable evidence that the two works tell very different stories.  Instead, his Complaint turns on narratives compared at only their most abstract level, with an emphasis on the championship game and its aftermath that is each work's "climax and denouement," where Plaintiff claims the plots supposedly move "forward in virtual lockstep." Compl. ¶¶ 25-30.  However, when you drill down on the actual expression of these supposed similar narratives, it becomes clear that any alleged similarity exists only with abstract ideas and *scenes à faire* that naturally flow from such ideas.

*Climactic Baseball Games.*  The "third acts" to the respective works, involving the championship baseball games, are the primary focus of Plaintiff's action.  Compl. ¶¶ 2, 27-30, App. at 9-12.[6]  But the works express this generic theme in very distinct ways.  In *Bucky's 9th*, the scene is set in a disused stadium in New Jersey so run-down that the infield is "encrusted with broken bits of glass" and the flag "boasted only 48 stars."  McNamara Decl., Ex. B at 137. Bucky misses most of the game because he is reconciling with Julie, and arrives in the ninth inning with Hill College trailing by one run.  His teammates "applaud[e]" when they see him

---

[6] The Appendix to the Complaint is peppered with commentary attempting to tie together the random similarities identified, no doubt because the actual language from the respective works is not remotely similar and more often than not actually reveals dramatically different plot developments.  For example, Plaintiff attempts to draw a comparison because both works reference a swimming pool.  Compl. App. at 11.  But, in Plaintiff's work, Bucky hits a foul ball that actually lands in a nearby "swimming pool."  McNamara Decl., Ex. B at 147-48.  Henry's at bat, on the other hand, includes only an allusion to a pool, and it is not in connection with a foul ball, but instead when he reluctantly steps up to pinch hit.  *Id.*, Ex. A at 472 ("[H]e dipped one foot inside the batter's box, as if testing the temperature of a pool.")

arrive.  *Id.* at 145.   With two outs and a runner on first, Bucky, one of the team's best hitters,

pinch hits for Hill College's "prematurely balding designated hitter, Scheinblum."  *Id.* at 147.

As he steps up to the plate, he feels inner peace, realizing that he "finally understand[s] what it

means to be my own man.  Part my father and part not my father – sometimes a dirtball,

sometimes not, and not necessarily in that order."  *Id.*  After taking the first pitch for a strike,

Bucky hits a long foul ball.  *Id.* at 148.  He then hears a conversation between the opposing

pitcher and catcher in which they resolve to hit him with the next pitch as retaliation for

vandalizing their school earlier in the season.  *Id.*  At this point, however, the narrative switches

to a conversation between Professor Goodnight and the Hill College's president, in which

Goodnight relates the story of Coach Willie's deception and the president, evidently

unconcerned, tells him it will be dealt with internally.  *Id.* at 148-50.  The focus then returns to

Bucky, who gets hit in the head by the next pitch and is awarded first base.  *Id.* at 150.  Hill

College loses the game, however, when the next batter singles and Bucky's teammate is thrown

out at home plate.  *Id.* at 151.

Beyond the non-protectible fact that in both books the main characters are hit by a pitch,[7]

the final game in *The Art of Fielding* is portrayed in a very different way and is imbued with the

knowledge of radically different motivations and characters.  The game takes place in a

"spanking-new" minor league stadium in South Carolina.  McNamara Decl., Ex. A at 450.

Henry arrives at the beginning of the game, after having been away from the team for a month

---

[7] Plaintiff's suggestion that "[t]he highly unusual and odd use of the beaning as a dramatic device in those specific circumstances constitutes, by itself, a substantial similarity between those baseball books," Compl. ¶ 27, is belied by the fact that Plaintiff was not even the first person to think of ending a baseball story this way.  A famous 1992 episode of *The Simpsons*, for instance, ends with the main character entering a baseball game as a pinch hitter in the bottom of the ninth inning, only to become the hero when he gets hit in the head by a pitch.  *The Simpsons, Homer at the Bat* (FOX television broadcast Feb. 20, 1992) ("*Homer at the Bat*"); *see also Major League II* (Warner Bros. 1994) (character hit by pitch when pinch hitting with runner on first base in bottom of eighth inning of climactic game).

due to his fielding problems and depression – rather than simply having missed part of this one game for personal reasons.[8]  *Id.* at 455-57.  His teammates approach him warily.  *Id.* at 457. While Bucky, one of Hill College's best players, almost immediately enters the game upon arrival, Henry spends the game coaching first base, in no condition to play.  *Id.* at 458. He only enters the game as a pinch hitter in the ninth inning as a last resort when Owen, having gotten word of Guert Affenlight's death, is unable to play.  *Id.* at 472.  As he steps to the plate, Henry does not experience a sense of calm like Bucky does; he is consumed by fear of failure.  *Id.*  And even the at-bats themselves proceed differently: while Bucky hits a long foul ball that nearly goes for a home run, Henry quickly realizes that, not having practiced for a month, he has no chance of getting a hit.  *Id.* at 473.  With the count no balls and two strikes, he therefore intentionally leans into a pitch and gets hit – whereas Bucky is intentionally "beaned" as retaliation.[9]  *Id.* at 474.  And, perhaps most strikingly, the two games end differently – unlike Hill College, Westish wins its championship game when Henry scores the winning run before passing out from a concussion.[10]  *Id.* at 476.  Plaintiff's suggestion that the two games are portrayed in "literal, play-by-play lockstep," Compl. App. at 9, is therefore without any

---

[8] To suggest, as Plaintiff does, that the scenes are identical because both feature "[t]he team's Prodigy [going] AWOL," Compl. ¶ 30, thus obscures the fact that every other aspect of the player's disappearance – its cause, its duration, its effect on the prodigy's baseball career, and the reaction it elicits from the team – is completely different in the two books.

[9] Plaintiff's claim that the pitcher in both works "feels at risk rather than being in control, despite the advantageous count," Compl. ¶ 30, is simply incorrect.  As Plaintiff himself concedes, the pitcher in *Bucky's 9th* "arrogantly premeditate[s]" hitting Bucky.  *See* Compl. App. at 11.  Although Bucky resigns himself to getting hit when he hears the pitcher's plan and is relieved to reach first base, the book never suggests that he intentionally tried to get hit.  In *The Art of Fielding*, however, Henry intentionally leans into the pitch with the goal of getting hit – diving "into that thing like it was a swimming pool," McNamara Decl., Ex. A at 476 – because, unlike Bucky, he knows he has no other chance of reaching base.

[10] Plaintiff alleges that both works are similar because the championship game is followed by a "cover-up of [a] father's apparent suicide."  Compl. ¶ 30.  This is misleading at best.  Bucky covered up his father's suicide immediately after his championship game *at Princeton*, which took place three years before the main events in the story – not the championship game at Hill College on which the rest of the Plaintiff's similarity claim relies.  *See* McNamara Decl., Ex. B at 152.  Henry and his friends exhume President Affenlight's body months after the championship game in the *The Art of Fielding*, but they do not do so to cover up a suicide – President Affenlight died of a heart attack.

18

foundation whatsoever.  In fact, there is little – let alone substantial – similarity between the actual expression of what Plaintiff identifies as *the* key similarity between the two works.[11]

*Recruiter-Mentor Plot*.  Plaintiff vainly attempt to draw a nexus between Mike/Henry's richly developed and complicated relationship and Willie/Bucky's obvious exploitation of each other to achieve their own selfish goals.  Thus, when Willie encounters Bucky at a carnival, Bucky only agrees to assume the role of a deaf man from Texas in order to get to the bottom of his father's death.  At no point is Willie a true mentor to Bucky and their relationship shares no overlap with the mental and physical training Mike imposes on Henry, causing him to truly develop as a person and a player.  Indeed, the allegations supposedly supporting this alleged similarity mischaracterize both works.  Compl. ¶ 28.[12]

*Illicit-Romance Plot.*  Plaintiff elides the overwhelming differences between the romantic relationship in the two books.  The relationship in *Bucky's* is a heterosexual relationship between a 24-year-old and a 22-year-old.  Although the book mentions that school policy prohibits Julie from dating a student, McNamara Decl., Ex. B at 97, 111, the relationship is not "illicit" as she and Bucky do not seem concerned about hiding it (they dance openly at a club around other Hill College students, *id*. at 114, and Bucky discusses the relationship with Willie and some of his teammates, *see id.* at 109, 119, 120, 122), and the epilogue makes it clear that Julie and Bucky

---

[11] The *Baseball Prodigy-Comes-of-Age Plot* is nothing more than a re-hash of the alleged similarities in the championship games toward the end of the respective works, with a handful of random "similarities" such as players who "read books on the bench during game action", or the "ace pitcher" who is a "primping lothario."  As for the championship game, Plaintiff again rests on such alleged similarities as the fact that the Prodigy arrives at the championship game and enters the game as a pinch-hitter, in the bottom of the ninth inning, etc.  Compl. ¶¶ 26-27.

[12] The Complaint alleges, for instance, that Mike and Willie are each work's "lone proletarian," but as *The Art of Fielding* describes in some detail, Henry also comes from a working-class background.  *See* McNamara Decl., Ex. A at 10, 23, 26-27.  Nor is it accurate to say Mike grew up "the ward of an aunt" – Mike lived alone after his mother died, and *The Art of Fielding* just says that he sometimes ate dinner at an aunt's nearby apartment.  *Id.* at 103.  And, while Mike spends much of the novel focused on getting into law school, Willie does not similarly "[s]ee[] law school as a way out of the working-class trap" – his wife is in law school, and Willie muses in passing that he should have finished college and gone to law school years before because he would have "made a great attorney."  McNamara Decl., Ex. B at 10-11.

end up together in the end.  *Id.* at 154-55.  The primary source of tension in the relationship is that Bucky is concealing his real identity and the fact he is not deaf.  The relationship in *The Art of Fielding*, on the other hand, is a homosexual relationship between a student and the 60 year-old previously heterosexual president of Westish College.  Secrecy is at the heart of the relationship and almost destroys it, *see, e.g.,* McNamara Decl., Ex. A at 281-83, 363*,* and Guert eventually loses his job (and perhaps even his life) when it is discovered.

 *Intergenerational Plot.*  At the center of this supposed similarity of a "long-running estrangement between a father and his adult child" is what Plaintiff calls "the dead-quarterback plot," which he characterizes as one of two "critical and defining aspects of the two works," along with their endings.  Compl. ¶¶ 2, 30, App. at 12-13.  In Plaintiff's work, Bucky's father – the Hall of Fame quarterback – breaks the law by fixing games, and then causes Willie to take the fall.  McNamara Decl., Ex. B at 124-26.  Wracked by guilt, he commits suicide.  Bucky discovers his suicide and covers it up by making it appear that his father died in a hunting accident.  *Id.* at 152.  These events lead Bucky to drop out of Princeton and, three years later, to follow Willie to Hill College.

 The dubious connection of this plot line to *The Art of Fielding* is clear from the fact that *The Art of Fielding*'s "dead quarterback" is not a quarterback at all – it is Guert Affenlight. Guert played quarterback for Westish College in his student days decades before the events in the book, but in the present day he is a literature scholar and university president, not a football player.  In fact, Guert emphasizes to Owen how much he has changed since his football career. McNamara Decl., Ex. A at 269.  Unlike Orville Bucks, Guert's "scandal" – an affair described with far more emotional depth than Orville Bucks's misdeeds – does not involve allegations of criminality, and he is able to avoid any further consequences by resigning.  *Id.* at 439-40, 447-49.

And, in contrast to Orville Bucks, Guert Affenlight does not commit suicide but dies of a heart attack. There is therefore no comparing the exhumation of Guert's body in *The Art of Fielding* to Bucky's cover-up of his father's suicide – Pella, Henry, Mike, and Owen move Guert's body to the lake not to conceal anything, but as a tribute to his love for the lake and the water. *Id.* at 494. Reburying Guert gives the characters in *The Art of Fielding* closure – the opposite of the turmoil experienced by Bucky after he covers up his father's suicide.

Over and over Plaintiff mistakes the use of common archetypes with copyright infringement. Indeed, Plaintiff has borrowed plot devices from the public realm that he now attempts to pass off as his own original ideas. Sports stories abound with examples of offbeat, underdog teams coming together to defeat (or nearly defeat) their rivals in dramatic fashion,[13] of characters who could be described as a "recruiter" or "mentor",[14] of young people using sports to connect with estranged parents, and of preternaturally-talented athletes overcoming mistakes to redeem themselves at the eleventh hour.[15] These stories typically feature a climactic game, and, whether the hero wins or loses, that game often ends in unusual fashion.[16] And stories about college life have their own tropes, which include "eccentric" students like the nerd and the "lothario," Compl. ¶ 26,[17] as well as romantic relationships between teachers or administrators

---

[13] *See, e.g., Miracle* (Buena Vista Pictures 2004); *Dodgeball: A True Underdog Story* (20th Century Fox 2004); *The Little Giants* (Warner Bros. 1994); *The Mighty Ducks* (Buena Vista Pictures 1992); *Hoosiers* (Orion Pictures 1986); *The Bad News Bears* (Paramount Pictures 1976).

[14] This is such a common aspect of sports stories that it has even been parodied in films such as *Dodgeball: A True Underdog Story* (20th Century Fox 2004) and *Happy Gilmore* (Universal Pictures 1996).

[15] One common way of heightening the dramatic effect is to have the hero make an unexpected return to play in the championship game after being absent. *See, e.g., Bend It Like Beckham* (Redbus Film Distribution 2002).

[16] *See, e.g., Homer at the Bat* (main character hit in head by pitch); *Tin Cup* (Warner Bros. 1996) (golfer records score of 12 on final hole of U.S. Open after repeatedly hitting ball into water); *Rookie of the Year* (20th Century Fox 1993) (hero records game-winning strikeout with underhand pitch); *Cool Runnings* (Buena Vista Pictures 1993) (Jamaican bobsled team flips sled and carries it across finish line); *Mr. Baseball* (Universal Pictures 1992) (main character wins climactic game with rare bunt on 0-2 count).

[17] Notably, Plaintiff does not mention that perhaps the most unique aspect of the Hill College roster – that it includes a female player – has no parallel in *The Art of Fielding*.

and students.[18]  Compl. ¶ 29.  Such "[g]eneral plot ideas are not protected by copyright law; they remain forever common property of artistic mankind."  *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985).

Next, Plaintiff dwells on alleged similarities that are nothing more than *scenes à faire,* or concepts that flow from a character or event.  Thus, in a story involving a newcomer to a small college's baseball team it necessarily follows that the main character "demonstrate[] his preternatural skill with a ball" (Compl. App. at 3), that he usurp someone else's position upon arriving at a new school (Compl. ¶ 26), and that players arrive at games carrying large equipment bags (Compl. App. at 10).  In stories about college baseball teams, one would expect to see the star player play shortstop, "the most demanding spot on the diamond," McNamara Decl., Ex. A at 8; for him to develop a mentor-protégé relationship with a coach or older student (Compl. ¶ 28); for the team to have a coach or team captain who "leads, challenges, hectors and despairs over the team" (Compl. App. at 5); for the final game to be a climactic affair decided in the bottom of the ninth inning (Compl. ¶ 30); and reference to well-worn baseball jargon like the "Spahn and Sain" doggerel (*id*.).  None of these abstract events or banal similarities[19] even begin to establish substantial similarity.

By comparison, in *Williams*, where the two works at issue shared the uncopyrightable idea of a dinosaur zoo, the Court explained that one would expect "electrified fences, automated tours, dinosaur nurseries, and uniformed workers," and found they were all unprotected stock elements.  *Williams*, 84 F.3d at 589.  Indeed, demonstrating a factual overlap that far exceeds

---

[18] *See, e.g.,* Jonathan Franzen, *The Corrections* (2001); J.M. Coetzee, *Disgrace* (1999).

[19] Plaintiff cites such superficial and meaningless similarities as the fact both works include minor characters with the last names Cox and Lopez, lead female characters in a lilac dress or skirt, a player referred to as "Buddha," and references to a "classic car" (not even the same type of car in each book). *See* Compl. ¶ 33.  Elements that are "so commonplace as to be likely to arise in independently created works" are not evidence of substantial similarity. *Currin v. Arista Records, Inc.*, 724 F. Supp. 2d 286, 294 (D. Conn. 2010).

anything at issue here, in *Williams* both works contained "stranded characters encountering ferocious dinosaurs, . . . characters in boats being pursued by dinosaurs, . . . dinosaurs escaping from paddock fences, . . . and characters escaping pack-hunting dinosaurs through the intervention of another dinosaur and a helicopter."   *Id.* at 590 n.3.  But even this laundry list of very specific similarities did not prevent dismissal.

    In case after case, courts in this Circuit dismiss copyright claims where there is far greater overlap in plot elements than anything alleged here.  *See Mallery v. NBC Universal, Inc.*, 2007 WL 4258196, at *6 (S.D.N.Y. Dec. 3, 2007) (no substantial similarity where works shared the ideas of "(1) painting a future in which tragic and destructive events take place, such as the destruction of landmark buildings in New York City; (2) having a prediction confirmed by a newspaper report; and (3) making an attempt to prevent a tragic event in light of the future"); *Sheldon Abend Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) (no substantial similarity between the short story *Rear Window* and the movie *Disturbia* where "both works [told] the story of a male protagonist, confined to his home, who spies on neighbors to stave off boredom, . . . discovers that one of his neighbors is a murderer, . . . is himself discovered by the suspected murderer, is attacked by the murderer, and is ultimately vindicated.").[20]

    At bottom, Plaintiff's claim is based on alleged plot similarities that rest on nothing more than unprotectible stock elements and cherry-picked and random similarities; not substantial similarity between the two works.  But even if Plaintiff believes that he recognizes aspects of his

---

[20] *See also Reyher*, 533 F.2d at 89, 92 (no substantial similarity despite an "identical sequence of events" with both works describing a lost child who has difficulty finding his mother because his description of her as the most beautiful woman in the world does not, at least to strangers, comport with the "homely woman" with whom he is ultimately reunited); *Allen*, 739 F. Supp. 2d 642 (dismissal of copyright claim alleging that *Harry Potter* and plaintiff's work shared the ideas of a young male protagonist, secret wizarding communities and wizard competitions).

4811-4484-4626v.9 3910089-000050

work in *The Art of Fielding*, he dramatically misconstrues the breadth of copyright law.  As one

court explained, if copyright protection were broad enough to encompass the stock elements and

general ideas Plaintiff alleges *The Art of Fielding* took,

> [o]ne could as easily claim (if the authors had lived
> contemporaneously) that Hemingway's *Old Man and the Sea*
> violated the copyright of Melville's *Moby Dick* (aging seaman
> encounters large fish), Hardy's *Tess of the d'Urbervilles* violated
> the copyright of Tolstoy's *Anna Karenina* (woman succumbs to
> passion, suffers consequences), or Joyce's *Portrait of the Artist as
> a Young Man* violated the copyright of Dickens' *David
> Coppperfield* (troubled childhood leads to writing career).

*Dunn v. Brown*, 517 F. Supp. 2d 541, 546 (D. Mass. 2007) (action involving two religious

thrillers and a corrupt Catholic Church).  Copyright protects expression; not ideas.

Notwithstanding the few loose similarities in plot that Plaintiff purports to find, he does not –

and could not – allege any similarity of protectible expression.

**B.      The Characters in the Works are Not Similar**

Any similarity among the characters of the respective works begins and ends with the fact

that both involve college baseball players.  "In determining whether characters are similar, a

court looks at the 'totality of [the characters'] attributes and traits as well as the extent to which

the defendants' characters capture the 'total concept and feel' of figures in [plaintiff's work]."

*Hogan*, 48 F. Supp. 2d at 309-10 (citing *Walker*, 784 F.2d at 50) (internal quotations omitted).

"The bar for substantial similarity in a character is quite high."  *Spielberg*, 748 F. Supp. 2d at

208.  In cases where the characters have shared much more specific characteristics, such as both

being half-vampires and half-humans named Nicholas Gaunt, *Hogan*, 48 F. Supp. 2d at 311,

minority artists with the ability to paint the future, *Mallery*, 2007 WL 4258196, at *7, African-

American FBI agents fearing for their jobs, *A Slice of Pie Prods., LLC v. Wayans Bros.*, 487 F.

Supp. 2d 41, 49 (D. Conn. 2007), or two "famous male wizards, initiated late into wizarding (in

pre/early adolescence), who receive formal education in wizarding and are chosen to compete in year-long wizard competitions," *Allen*, 739 F. Supp. 2d at 659, courts have found no substantial similarity as such shared traits are nothing more than general prototypes too indistinct to merit protection.

Here, the main characters at the center of the respective works have almost nothing in common, beyond being shortstops for college baseball teams. Bucky is the son of an NFL star, who joined one of the country's top college baseball programs straight out of high school; Henry is the son of a blue-collar South Dakota family, who was not planning on playing college baseball at all until Mike recruited him. Henry is at Westish College because that was the only school that would let him play baseball; Bucky is at Hill College on false pretenses in order to solve the mystery what happened to his father. Henry "played shortstop, only and ever shortstop" growing up, McNamara Decl., Ex. A at 8; Bucky is a pitcher who only switches to shortstop in order to avoid being recognized. He appears to have no reverence for the position or even the sport akin to Henry's devotion to *The Art of Fielding* and its author, famous shortstop Aparicio Rodriguez. Henry is shy and, until he has an affair with Pella, appears to have no time for girls; not only does Bucky quickly fall in love with Julie when he arrives at Hill College, but he previously had a serious girlfriend named Justine. While Bucky is tormented by thoughts of his father, Henry rarely seems to think about his parents after he realizes that they are "five hundred miles away" and cannot control his life at college. *Id.* at 28. And, just as Bucky never goes through anything like Henry's struggle with his on-field performance and self-confidence, Henry never has to deal with covering up deception or unravelling a family mystery.

Other characters cited by Plaintiff likewise share only generic traits. Contrary to Plaintiff's allegations, for instance, there are no meaningful similarities between the characters of

Willie in *Bucky's 9th* and Mike in *The Art of Fielding*. Aside from the differences in the "recruiter-mentor" plots discussed above, the characters themselves could hardly be more different. Willie is Black, an ex-con, about forty years old, "a small hairball of a man" with a beard and a large afro, McNamara Decl., Ex. B at 7, 10. Mike, on the other hand, is one-of-a-kind: Jewish, he is both a hulking six-foot-two, two-hundred-thirty pound student jock, and an intellectual who "recite[s] lines from his favorite philosophers, Marcus Aurelius and Epictetus" while lifting weights with Henry. McNamara Decl., Ex. A at 47, 103, 163. Willie is married, but *Bucky's 9th* mentions his wife only in passing; Mike's on-and-off relationship with Pella is a major focus of *The Art of Fielding*. Willie is a former NFL star; Mike knows that, because of his creaky knees, his athletic career will be over when he graduates college. Willie's main motivation is to save Hill College's baseball team, and his position as its coach. Mike, on the other hand, spends most of *The Art of Fielding* with no idea of what he wants to do with his life after graduation.

Similarly, as discussed above, Plaintiff's repeated attempts to connect Bucky's father and Guert Affenlight on the basis that both are former quarterbacks, Compl. ¶¶ 2, 30, 32, App. at 12, falls flat. Next, Plaintiff avoids the obvious fact that the key characters in the two works are strikingly *dissimilar* by mixing and matching attributes of one character in *Bucky's 9th* to multiple characters in *The Art of Fielding*, or vice-versa. Thus, Plaintiff compares Bucky to no fewer than four different characters in *The Art of Fielding*: Henry for purposes of the "Baseball Prodigy-Comes-of-Age Plot" and the "Baseball Climax," Pella for purposes of the "Intergenerational Plot", and somehow both Owen and Guert Affenlight for purposes of the "Illicit-Romance Plot." *See* Compl. ¶¶ 26-32, App. at 8. Along with being Bucky, Guert Affenlight is apparently also both Orville Bucks (for purposes of the "Intergenerational Plot")

26

and Julie Ross (for purposes of the "Illicit-Romance Plot"), Compl. ¶¶ 29-30; and Mike

Schwartz is Willie Chase for purposes of the "Recruiter-Mentor Plot" and Hill College baseball

player Wayne Raines in the climactic game.  Compl. ¶¶ 28, 30.  Straining to the point of

absurdity, Plaintiff even compares former NFL superstar Orville Bucks to *Herman Melville* at

one point.  *See* Compl. ¶ 30.[21]

While Plaintiff cherry-picks certain characters as (dubious) evidence of similarity, not

coincidentally the Complaint just ignores other characters in the two works.  *The Art of Fielding*

has a trove of well-developed characters including Pella and Owen, along with a host of well-

developed or unusual minor characters including Pella's ex-husband David; Owen's mother

Genevieve; Chef Spirdocus, the cafeteria manager who hires Pella, teaches her to cook, and

helps her develop independence; and even Henry's baseball hero Aparicio Rodriguez.  Aside

from Bucky and arguably Willie and Julie, no other characters in *Bucky's 9th* are developed

beyond stereotypical renderings like the archetypical villain Professor Goodnight and the stock

characters who fill out the Hill College baseball team.  Simply put, none of the other characters

are remotely similar between the two works.  Aside from the generalized idea of a talented

shortstop at a small college, there are no similarities, let alone substantial similarity.

### C.     The Settings of the Works are Not Similar

Plaintiff once again resorts to abstraction, stripped of any expressive detail, and claims

the novels share a common setting because they both take place in "a small, obscure and

financially struggling (yet academically proud) liberal arts school whose athletic teams compete

in the lowest collegiate ranks, Division III, and thus do not have the benefit of athletic

scholarships."  Compl. ¶ 23.

---

[21] Plaintiff pleads that "[f]acing the threat of scandal, the exposed character seeks guidance from a statue of his lifelong idol."  Compl. App. at 8.  This appears to refer to the Orville Bucks statue outside Veterans Stadium in Philadelphia, and the Herman Melville statue on the Westish campus.

As an initial matter, setting a story on a college campus is not remotely protectible. *See Blakeman v. Walt Disney Co.*, 613 F. Supp. 2d 288, 307 (E.D.N.Y. 2009) (it would be "irrational" to claim that "the movie 'Animal House' is substantially similar to 'Rudy' or 'Good Will Hunting' because the movies all focus on college life").  And most of the similarities plaintiff cites are equally unprotectible because they follow directly from that college setting. Most liberal arts colleges with NCAA sports teams, for instance, compete at the Division III level, and all Division III schools are prohibited from offering athletic scholarships.  And almost every college is, at least in its own eyes, both "academically proud" and in need of more money.

Even if a small-college setting were a protectible element – plainly it is not – the actual settings for the two novels are entirely distinct.  Moreover, these distinctions are critical to the narratives of the two works.  Hill College's unique status as a college for the deaf, for instance, is what necessitates Bucky's deception and drives much of the plot in *Bucky's 9th*.  And Willie only recruits Bucky in the first place because Hill College's financial situation is so dire it must choose between its baseball program and a new science lab.  Though Westish's trustees complain about declining fundraising, the school faces no such critical threat, and can even afford to send its baseball team to tournaments in Florida and South Carolina.  Whereas Hill College is located just nine commuter rail stops from downtown Philadelphia and characters make a number of trips into the city, Westish's idyllic setting in northern Wisconsin, hours from the nearest major city, is an important part of how it is portrayed in *The Art of Fielding*.  *See, e.g.*, McNamara Decl., Ex. A at 53, 61.  And Westish's most unique and imaginative feature – its historical connection to Herman Melville and the "thriving cult of Melvilleania" among its students, McNamara Decl., Ex. A at 62 – has no analogue at Hill College.  In short, there is no substantial similarity between the settings of the two works.

D.    **The Themes of the Works Are Not Similar**

The two works are also strikingly different with respect to their themes.  In *The Art of Fielding*, the baseball plot is intertwined with such themes as the struggles of working class students to fit into an upper-middle class community; how we balance helping others with our own needs; the role of sports in college life; and the conflict between love and professional ambition and duty.  In contrast, *Bucky's 9th* is dominated by themes related to the relationship between fathers and sons, sin and redemption, and deception.  To claim that the works share thematic similarities because they involve college baseball "would be as irrational as saying the movie 'Animal House' is substantially similar to 'Rudy' or 'Good Will Hunting' because the movies all focus on college life."  *Blakeman*, 613 F. Supp. 2d at 307 (no substantial similarity where the themes of the movies shared "nothing in common other than the backdrop of a Presidential election").  The themes of these works could not be more dissimilar.

E.    **The Total Concept and Feel of the Works Are Not Similar**

The total concept and feel of a work refers to the way the author selected, coordinated and arranged the elements of the work, taking into consideration similarities in "mood, details or characterization."  *Reyher*, 533 F.2d at 91-92.  In comparing the total concept and feel of the works, courts consider the works as a whole.  *See Jones*, 733 F. Supp. at 754.

Here, the total concept and feel of the works differ completely.  As demonstrated above, *Bucky's 9th* and *The Art of Fielding* are not similar in plot, themes, characters, or settings.  On top of these differences, the stylistic differences between the works remove any doubt that the works are not similar.  The pace and breadth of the two works are dramatically different: *The Art of Fielding* is a 512-page novel that takes place over the course of about three years, whereas *Bucky's 9th* is a compact 155-page story which mostly takes place over a few weeks.  *The Art of Fielding* is told in third person, mostly in chronological order, and adopts the perspective of a

number of different characters.  The main plot of *Bucky's 9th*, on the other hand, is told entirely

in first person from Bucky's perspective, and it is mixed with regular flashbacks, which are

mostly told to Bucky in the second person.

Nor is this a case where *The Art of Fielding* "copies the original way in which [Plaintiff]

has selected, coordinated, and arranged the[] unprotectable elements to such an extent that [it] is

substantially similar to the 'expression of ideas' and 'total concept and overall feel' of the copied

work." *Williams v. A&E Television Networks*, 122 F. Supp. 3d 157, 162-63 (S.D.N.Y. 2015).

Rather, to establish similarities in total concept and feel through the selection and arrangement of

unprotectible elements, the similarities between the two works must be "overwhelming." *CBS

Broad. v. ABC, Inc.*, 2003 U.S. Dist. LEXIS 20258, at *15 (S.D.N.Y. Jan. 14, 2003); see also

*Boisson v. Banian, Ltd.*, 273 F.3d 262, 274 (2d Cir. 2001) (finding substantial similarity based on

selection and arrangement of unprotected elements where there was an "enormous amount of

sameness").  Here, of course, there is no "overwhelming" similarity between the two works.

There is, in fact, an enormous amount of difference between them.  Although the total concept

and feel of the works must of course be examined as a whole, even the works' portrayal of their

respective concluding baseball games are, as noted above, dramatically different.  Plaintiff

cannot rest an entire copyright infringement claim on the fact both stories describe the main

character getting hit by a pitch in similar – though far from identical – circumstances.

For this reason, Plaintiff also cannot establish substantial similarity by demonstrating that

*The Art of Fielding* took "the 'fundamental essence or structure' of [his] work." *Arica Inst.*, 970

F.2d at 1073.  Plaintiff cannot meet this "comprehensive non-literal similarity" standard simply

by taking purported similarities out of context and selectively attaching percentage numbers as

an indication of where they occur in each novel.  *See* Compl. App. at 8-13.[22]  Rather, the Court

must still "weigh[] the 'total concept and feel' of the works including their 'theme, characters,

plot, sequence, pace, and setting,'" *Penguin Random House LLC v. Colting*, --- F. Supp. 3d ---,

2017 WL 3977000, at *4 (S.D.N.Y. Sept. 7, 2017) (citation omitted), and there is no

comprehensive non-literal similarity where two works express the same general plot ideas in

different ways.  *See Arden v. Columbia Pictures Indus., Inc.*, 908 F. Supp. 1248, 1260 (S.D.N.Y.

1995) (two works about a man experiencing a repeated day were not substantially similar

because they "differ[ed] greatly in terms of plot and fundamental essence"); *Dickerson v. WB*

*Studio Enters., Inc.*, 2017 WL 3891696, at *5 (S.D.N.Y. Sept. 5, 2017) ("The similarities

Plaintiff identifies do not speak to the fundamental essence of either work—indeed, by picking

and choosing among small aspects of each work in search of comparable elements, Plaintiff only

highlights the degree to which the works are, at their core, highly distinct creative works.").[23]

   In the end, when one considers the actual expression of the respective works in terms of

plot, characters, settings, themes and total concept and feel – instead of the random list of

abstract similarities identified by Plaintiff – only one conclusion can be reached:  Plaintiff's

work, *Bucky's 9th*, is not substantially similar to Harbach's novel *The Art of Fielding*.  Because

---

[22] Of course, Plaintiff omits the percentage numbers when comparing portions of the novels that occur at completely different points.  *See, e.g.*, Compl. App. at 13 (comparing page 11 of *Bucky's 9th* with page 425 of *The Art of Fielding*); *id.* at 14 (comparing page 25 of *Bucky's 9th* with page 243 of *The Art of Fielding*).

[23] Plaintiff's claim that substantial similarity exists between the two works because "[d]uring their third acts, the plots move forward in virtual lockstep," Compl. ¶ 30, echoes the Ninth Circuit's formulation of this test, which holds that "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element."  *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002).  But to the extent that the Ninth Circuit's test differs from the Second Circuit's "fundamental essence or structure" approach, it is of course not applicable here.  And, in any event, even the Ninth Circuit's test requires a "totality of similarities" to create a viable infringement claim out of unprotectible elements.  *See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178-79 (9th Cir. 2003).  Given the pervasive differences between the two works, it would therefore also not support a finding of substantial similarity here.  *See, e.g.*, *8th Wonder Entm't, LLC v. Viacom Int'l, Inc.*, 2016 WL 6882832, at *8 (C.D. Cal. Nov. 22, 2016) (no substantial similarity under *Metcalf* where "any overlap or sequencing is largely superficial and . . . there are significant differences between the work[s].").

Plaintiff does not allege any taking of protectible expression, he cannot sustain a copyright claim and this action should be dismissed.

## **CONCLUSION**

Since Plaintiff cannot allege substantial similarity between the two works at issue, Defendant Chad Harbach respectfully submits that the Court should grant his motion to dismiss the Complaint with prejudice under Rule 12(b)(6).

Dated: New York, New York
      November 10, 2017

                                Respectfully submitted,

                                DAVIS WRIGHT TREMAINE LLP

                                By:  /s/ Elizabeth A. McNamara
                                Elizabeth A. McNamara
                                Adam Lazier
                                1251 Avenue of the Americas, 21st Floor
                                New York, New York  10020
                                Telephone:  (212) 489-8230
                                Facsimile:  (212) 489-8340
                                Email:    lizmcnamara@dwt.com
                                                adamlazier@dwt.com

                                *Attorney for Defendant Chad Harbach*