UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

CHARLES C. GREEN,                       :
                                        :        Civil Action No.: 17 Civ. 6984 (AKH)
                      Plaintiff,        :
                                        :
            - against -                 :
                                        :
                                        :
CHAD D. HARBACH,                        :
                                        :
                      Defendant.        :
------------------------------------------------------------- x

# REPLY MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Elizabeth A. McNamara
Adam Lazier
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York  10020
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340

*Attorneys for Defendant Chad Harbach*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT ................................................................................................................................ 2

     I.      PLAINTIFF DIREGARDS THE GOVERNING STANDARD FOR THIS
            MOTION BECAUSE IT DOOMS HIS CLAIM ..................................................... 2

     II.     THE WORKS ARE NOT SUBSTANTIALLY SIMILAR .................................... 4

           A.     The Settings ............................................................................................. 5

           B.     The Plots .................................................................................................. 7

           C.     The Characters ....................................................................................... 17

           D.     Themes .................................................................................................... 18

           E.     Total Concept and Feel .......................................................................... 19

           F.     No Verbatim Copying ............................................................................ 21

     III.    PLAINTIFF'S ARGUMENT ON COSTS IS PREMATURE ............................ 23

CONCLUSION ........................................................................................................................... 23

4823-4743-0745v.7 3910089-000050

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acker v. King*,
46 F. Supp. 3d 168 (D. Conn. 2014) .......................................................................3

*Alexander v. Murdoch*,
502 F. App'x 107 (2d Cir. 2012) ............................................................................3

*Allen v. Scholastic Inc.*,
739 F. Supp. 2d 642 (S.D.N.Y. 2011) ..........................................................3, 7, 20

*Arden v. Columbia Pictures Indus., Inc.*,
908 F. Supp. 1248 (S.D.N.Y. 1995) ......................................................................17

*Arica Inst. Inc. v. Palmer*,
970 F.2d 1067 (2d Cir. 1992) ................................................................................21

*Boisson v. Banian, Ltd.*,
273 F.3d 262 (2d Cir. 2001) ..................................................................................20

*Brown v. Time Warner, Inc.*,
2017 WL 6210847 (S.D.N.Y. Dec. 6, 2017) ...........................................................3

*Canal+ Image UK Ltd. v. Lutvak*,
773 F. Supp. 2d 419 (S.D.N.Y. 2011) ....................................................................3

*Castorina v. Spike Cable Networks, Inc.*,
784 F. Supp. 2d 107 (E.D.N.Y. 2011) ....................................................................3

*CBS Broad. v. ABC, Inc.*,
2003 U.S. Dist. LEXIS 20258 (S.D.N.Y. Jan. 14, 2003) ......................................20

*Crane v. Poetic Prods. Ltd.*,
593 F. Supp. 2d 585 (S.D.N.Y. 2009), *aff'd*, 351 F. App'x 516 (2d Cir. 2009) .....................18

*Dam v. Kirke La Shelle Co.*,
166 F. 589 (S.D.N.Y. 1908), *aff'd*, 175 F. 902 (2d Cir. 1910) ................................9

*Dean v. Cameron*,
53 F. Supp. 3d 641 (S.D.N.Y. 2014) .......................................................................3

*Dickerson v. WB Studio Enters., Inc.*,
--- F. Supp. 3d ---, 2017 WL 3891696 (S.D.N.Y. Sept. 5, 2017) ...........................3

4823-4743-0745v.7 3910089-000050

*DiTocco v. Riordan*,
  496 F. App'x 126 (2d Cir. 2012), *aff'd*, 496 F. App'x 126 (2d Cir. 2012)............................3, 8

*Effie Film, LLC v. Pomerance*,
  909 F. Supp. 2d 273 (S.D.N.Y. 2012)................................................................................3

*Gaste v. Kaiserman*,
  863 F.2d 1061 (2d Cir. 1988).........................................................................................1

*Hallford v. Fox Entm't Grp., Inc.*,
  2013 WL 541370 (S.D.N.Y. Feb. 13, 2013), *aff'd*, 556 F. App'x 48
  (2d Cir. 2014).................................................................................................................3

*Hoehling v. Universal City Studios, Inc.*,
  618 F.2d 972 (2d Cir. 1980)............................................................................................5

*Hogan v. DC Comics*,
  48 F. Supp. 2d 298 (S.D.N.Y. 1999)..............................................................................17

*Kaye v. Cartoon Network Inc.*,
  2017 WL 5197152 (S.D.N.Y. Nov. 8, 2017)....................................................................3

*Klauber Bros. v. Bon-Ton Stores, Inc.*,
  557 F. App'x 77 (2d Cir. 2014) .......................................................................................3

*Malkin v. Dubinsky*,
  146 F. Supp. 111 (S.D.N.Y. 1956)..................................................................................9

*Mallery v. NBC Universal, Inc.*,
  2008 WL 719218 (S.D.N.Y. Mar. 18, 2008), *aff'd*, 331 F. App'x 821
  (2d Cir. 2009)................................................................................................................23

*Maurizio v. Goldsmith*,
  84 F. Supp. 2d 455 (S.D.N.Y.), *aff'd*, 230 F.3d 518 (2d Cir. 2000) ...........................9

*McDonald v. West*,
  669 F. App'x 59 (2d Cir. 2016) .......................................................................................3

*Mena v. Fox Entm't Grp., Inc.*,
  2012 WL 4741389 (S.D.N.Y. Sept. 29, 2012)..............................................................1, 3

*Muller v. Twentieth Century Fox Film Corp.*,
  2011 WL 3678712 (S.D.N.Y. Aug. 22, 2011)................................................................23

*Nobile v. Watts*,
  2017 WL 467464 (S.D.N.Y. Oct. 16, 2017), *appeal docketed*,
  No. 17-3752 (2d Cir. Nov. 14, 2017)...........................................................................3, 21

4823-4743-0745v.7 3910089-000050

*Penguin Random House, LLC v. Colting*,
--- F. Supp. 3d ---, 2017 WL 3977000 (S.D.N.Y. Sept. 7, 2017) ...........................................17

*Peter F. Gaito Architecture, LLC v. Simone Development Corp.*,
602 F.3d 57 (2d Cir. 2010)...............................................................................................2, 3

*Porto v. Guirgis*,
659 F. Supp. 2d 597 (S.D.N.Y. 2009)...................................................................................7

*Reyher v. Children's Television Workshop*,
533 F.2d 89 (2d Cir. 1976).....................................................................................................8

*Salinger v. Random House, Inc.*,
811 F.2d 90 (2d Cir. 1987)...................................................................................................21

*Schliefer v. Berns*,
2017 WL 3084406 (E.D.N.Y. July 19, 2017), *appeal docketed*,
No. 17-2972 (2d Cir. Sept. 22, 2017) ...................................................................................3

*Sheldon Abend Revocable Tr. v. Spielberg*,
748 F. Supp. 2d 200 (S.D.N.Y. 2010).................................................................4, 8, 17, 20

*Sheldon v. Metro-Godwyn Pictures Corp.*,
81 F.2d 49 (2d Cir. 1936) .......................................................................................................9

*Smith v. Little, Brown & Co.*,
245 F. Supp. 451 (S.D.N.Y. 1965), *aff'd*, 360 F.2d 928 (2d Cir. 1966) ...................................9

*Starobin v. King*,
137 F. Supp. 2d 93 (N.D.N.Y. 2001) ...................................................................................21

*Stodart v. Mut. Film Corp.*,
249 F. 507 (S.D.N.Y. 1917), *aff'd*, 249 F. 513 (2d Cir. 1918) .................................................9

*Walker v. Time Life Films, Inc.*,
784 F.2d 44 (2d Cir. 1986)...............................................................................................2, 5

*Williams v. A&E Television Networks*,
122 F. Supp. 3d 157 (S.D.N.Y. 2015)...................................................................................3

*Williams v. Crichton*,
84 F.3d 581 (2d Cir. 1996)...........................................................................................3, 4, 6, 7

**Statutes**

17 U.S.C. § 505...................................................................................................................23

4823-4743-0745v.7 3910089-000050

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) .............................................................................................1, 23

Fed. R. Civ. P. 54(d) ......................................................................................................23

4823-4743-0745v.7 3910089-000050

Defendant Chad Harbach hereby submits this Reply in further support of his motion pursuant to Fed. R. Civ. P. 12(b)(6) for an order dismissing the Complaint[1] and awarding him his attorneys' fees and costs.

## PRELIMINARY STATEMENT

On this motion, Harbach established that *The Art of Fielding* and *Bucky's 9th* are not remotely similar – let alone substantially similar.  The two works have dramatically different plots, characters, settings, themes, and "total concepts and feel," and the only actual similarities between them are nothing more than general ideas, *scènes à faire*, and random common words or phrases that do not amount to copyright infringement under the well-developed case law.  In his Opposition, Dkt. 17 ("Opp."), Plaintiff refuses to grapple with just how fundamentally distinct the two works are in each of these controlling elements and instead relies on an abstract, scattershot list of supposed similarities, many of which are patently false.  Opp. at 17-22, App. 1-App. 4.  Perhaps most telling, Plaintiff appears so wary of drilling down and examining the actual expression of the works –which reveals no real similarities – that his opposition opens with several pages devoted to ostensibly showing access, which is not even an issue on this motion.[2]

No amount of obfuscation or avoidance of the actual issues before this Court changes the fact that a simple back-to-back review of the two novels at issue dictates the dismissal of this

---

[1] All defined terms herein bear the same meaning as in the Memorandum in Support of Harbach's Motion to Dismiss, Dkt. 12 (the "Opening Brief" or "Mot.").

[2] In fact, Harbach actually concedes access, *solely* for purposes of this motion.  Mot. at 9.  In these circumstances, "the Court does not consider at this stage [Plaintiff's] ability or inability to prove access," and Plaintiff's "allegations concerning evidence of actual copying are inapposite" to the motion to dismiss.  *Mena v. Fox Entm't Grp., Inc.*, 2012 WL 4741389, at *3 n.3 (S.D.N.Y. Sept. 29, 2012) (dismissing case for lack of substantial similarity).  Moreover, even looking at Plaintiff's allegations of supposed access, they reveal nothing more than exactly the sort of "mere conjecture or surmise" that courts have held not to be sufficient.  *See Gaste v. Kaiserman,* 863 F.2d 1061, 1067 (2d Cir. 1988). The best "evidence" that Green comes up with to support access is that Harbach has many friends in the literary community so he must have received the manuscript from some "industry insider," or, even more far-fetched, he claims that a *Vanity Fair* article somehow contained a "coded" message that Harbach copied his book.  Opp. at 4-5.

4823-4743-0745v.7 3910089-000050

action.  Employing the actual governing legal standards – not Plaintiff's attempt to re-write the

law – the Court should disregard Plaintiff's self-serving descriptions and simply read and

compare the two works.  "[T]he works themselves, not descriptions or impressions of them, are

the real test for claims of infringement."  *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 51 (2d

Cir. 1986).  Ultimately, when one reads the actual works, only one conclusion can reasonably be

reached: the two novels are not substantially similar.

## ARGUMENT

## I.   PLAINTIFF DIREGARDS THE GOVERNING STANDARD FOR THIS MOTION BECAUSE IT DOOMS HIS CLAIM

As an initial matter, Plaintiff misstates the legal standard that applies to this motion.  He

begins by incorrectly suggesting that motions to dismiss for lack of substantial similarity are

governed by a "specialized standard" under which "dismissal is warranted only in limited

circumstances."  Opp. at 29.  This argument is in fact foreclosed by the decision Plaintiff himself

calls "[t]he leading case" on this issue, *Peter F. Gaito Architecture, LLC v. Simone Development

Corp.*, 602 F.3d 57, 64 (2d Cir. 2010), which expressly recognized that "it is entirely appropriate

for the district court to consider the similarity between those works in connection with a motion

to dismiss, because the court has before it all that is necessary in order to make such an

evaluation."  The court noted that, "[w]hen a court is called upon to consider whether the works

are substantially similar, no discovery or fact-finding is typically necessary, because 'what is

required is only a visual comparison of the works.'"  *Id.* (citation omitted).  It followed that "[i]f,

in making that evaluation, the district court determines that the two works are 'not substantially

similar as a matter of law,' the district court can properly conclude that the plaintiff's complaint,

together with the works incorporated therein, do not 'plausibly give rise to an entitlement to

relief.'"  *Id.* (citations omitted).  In keeping with the Second Circuit's clear guidance, numerous

2

courts since *Gaito* have dismissed copyright infringement actions at the pleadings stage for lack of substantial similarity.[3]  Plaintiff does not cite a single case, or give any reason, why this case is different.

Plaintiff also misstates the standard for substantial similarity.  Plaintiff is just wrong when he claims a court should only dismiss a case for lack of substantial similarity if "there is an absence of (or almost no) similarity between the protected elements in the two works."  Opp. at 31.  The Second Circuit has actually made the opposite clear, observing that "trivial" or "scattered" similarities – no matter how numerous – will not stand in the way of dismissal. *Williams v. Crichton*, 84 F.3d 581, 590-91 (2d Cir. 1996).  Plaintiff plainly hopes that he can defeat this motion by demonstrating the presence of *any* similarity at all between the two works – regardless of how abstract, incidental, or unprotectible that similarity may be – and he fills his Complaint and Opposition with almost fifty pages of lists that purport to set out similarities between the two works, some of which Plaintiff even describes as "random duplications."  *See* Compl., App. at 6.  But, as Harbach made clear on this motion, courts have repeatedly rejected this "scattershot approach" because "it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another."  *Williams*, 84 F.3d at 590; *see* Mot. at 10-11, 14 (citing cases).  Plaintiff all but ignores this in his

---

[3] *See, e.g.*, *McDonald v. West*, 669 F. App'x 59 (2d Cir. 2016); *Klauber Bros. v. Bon-Ton Stores, Inc.*, 557 F. App'x 77 (2d Cir. 2014); *DiTocco v. Riordan*, 496 F. App'x 126 (2d Cir. 2012); *Alexander v. Murdoch*, 502 F. App'x 107 (2d Cir. 2012); *Brown v. Time Warner, Inc.*, 2017 WL 6210847 (S.D.N.Y. Dec. 6, 2017); *Kaye v. Cartoon Network Inc.*, 2017 WL 5197152 (S.D.N.Y. Nov. 8, 2017); *Nobile v. Watts*, 2017 WL 467464 (S.D.N.Y. Oct. 16, 2017), *appeal docketed*, No. 17-3752 (2d Cir. Nov. 14, 2017); *Dickerson v. WB Studio Enters., Inc.*, --- F. Supp. 3d ---, 2017 WL 3891696 (S.D.N.Y. Sept. 5, 2017); *Schliefer v. Berns*, 2017 WL 3084406 (E.D.N.Y. July 19, 2017), *appeal docketed*, No. 17-2972 (2d Cir. Sept. 22, 2017); *Williams v. A&E Television Networks*, 122 F. Supp. 3d 157 (S.D.N.Y. 2015); *Dean v. Cameron*, 53 F. Supp. 3d 641 (S.D.N.Y. 2014); *Acker v. King*, 46 F. Supp. 3d 168 (D. Conn. 2014); *Hallford v. Fox Entm't Grp., Inc.*, 2013 WL 541370 (S.D.N.Y. Feb. 13, 2013), *aff'd*, 556 F. App'x 48 (2d Cir. 2014); *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273 (S.D.N.Y. 2012); *Mena*, 2012 WL 4741389; *Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642 (S.D.N.Y. 2011); *Canal+ Image UK Ltd. v. Lutvak*, 773 F. Supp. 2d 419 (S.D.N.Y. 2011); *Castorina v. Spike Cable Networks, Inc.*, 784 F. Supp. 2d 107 (E.D.N.Y. 2011).

Opposition, never explaining why the trivial similarities he identifies – which include things like the color of a character's underwear, minor characters in the books sharing common names like Cox and Lopez, and a first date at an Italian restaurant – should be considered substantial.  In fact, in his Opposition, Plaintiff doubles down on this flawed strategy, filing four more appendices listing scattered and trivial purported similarities between the works in the hopes of finding *something* that will stick.  *See* Opp., App. 1-App. 4.  As the law dictates, however, this Court should review the works themselves, not Plaintiff's self-serving, cherry-picked characterization of them.

## II.    THE WORKS ARE NOT SUBSTANTIALLY SIMILAR

When the appropriate legal standards are applied to the works in question, it becomes clear that *The Art of Fielding* and *Bucky's 9th* are not substantially similar – these are two very different works united only by the unprotectible idea that they both depict an underdog college baseball team with a star shortstop.  *See* Mot. at 1, 14-32.  When the underlying works contain both protectible and unprotectible elements, as here, the Court employs the "discerning ordinary observer test," and first disregards any non-protectible elements in the works – general ideas, stock scenes and themes (known as *scènes à faire*), and ordinary words or phrases – and then determines whether the remaining protectible elements are substantially similar.  *Id.* at 9-12 (citing cases).  In performing this comparison of two works of fiction, the Court focuses on the plot, characters, themes, setting, as well as the "total concept and feel" of the works.  *See Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 204-05 (S.D.N.Y. 2010).[4]

---

[4] Plaintiff's argument that Harbach "cannot defend his large-scale misappropriation of Green's protected expression by citing to some differences between the works," Opp. at 33, misses this point.  While differences in one part of a work will not of course excuse true substantial similarity, courts cannot assess substantial similarity in the first place without considering the differences – the absence of similarity – between the works in question.  *See, e.g.*, *Williams*, 84 F.3d at 589-90 (no substantial similarity because "the total concept and feel of the two works differ substantially" and "even those scenes that appear similar in their abstract description prove to be quite dissimilar once examined in any detail").

On this motion, Harbach painstakingly engaged in this comparison of *The Art of Fielding* and *Bucky's 9th*, demonstrating conclusively that, when stripped of their unprotectible elements, the two works are not remotely similar.  Mot. at 14-32.  Much of Plaintiff's Opposition simply repeats the same purported abstract or selective similarities set out in the Complaint, even those that Harbach's Opening Brief pointed out mischaracterize the books.  *See* Opp. at 15-28.[5]  It makes no serious attempt to distinguish protectible expression from abstract premises and ideas, themes, and *scènes à faire*.[6]  This failure, of course, simply reflects the reality that when the unprotectible elements are filtered out, any comparison of the actual expression reveals that the works are starkly different.

### A.    The Settings

Plaintiff places great stock in his contention that the settings of the two works are "unique" in that they are the "only <u>baseball</u> novels involving Division III college teams at academic schools with financial issues and unsuccessful athletic programs."  Opp. at 15

---

[5] Because Plaintiff cannot establish substantial similarity by compiling a list of scattered and trivial similarities between the works, it is not necessary for Defendants to separately analyze each of the purported similarities cited by Plaintiff – most of which he does not even deem important enough to discuss in the body of his Complaint or Opposition.  This is particularly true because Plaintiff never distinguishes abstract ideas from the works' actual expression, and the events he cites inevitably bear no resemblance once one looks at how the "similarity" actually appears in the respective works.  For example, Plaintiff continues to claim that both Bucky and Henry were "AWOL" before the final game, Opp. at 21, ignoring that Henry's departure from the team lasted weeks and was accompanied by a serious psychological undoing, whereas Bucky was simply late to the last game because he was resolving issues with his girlfriend. Mot. at 18 n.8.  Similarly, he claims that the Bucky/Julie and Guert/Owen relationships are similar because both Julie and Guert see drinking coffee as an important bonding ritual.  Opp. at 8, 12; Compl., App. at 5.  But, again, this ignores all relevant context.  Coffee represents the doomed and illicit nature of Guert's relationship with Owen in *The Art of Fielding*.  McNamara Decl., Ex. A at 228-29, 281.  In *Bucky's 9th*, however, coffee represents a stable and permanent relationship – Julie mentions sharing coffee every morning to Bucky as an example of how she wants to settle down with one person.  McNamara Decl., Ex. B at 61.

[6] Instead, Plaintiff argues in his Opposition that Harbach "misstates the law" on the *scène à faire* doctrine.  Opp. at 32.  But he equates the doctrine with two unrelated things: the rule that copyright law protects "characters who are sufficiently delineated to be original," and the rule that "while general plot ideas are not copyrightable, specific ones are."  *Id.*  The *scène à faire* doctrine, on the other hand, provides that even specific plot ideas or settings are not protectible if they are "standard[] in the treatment of a given topic" or "necessarily result from the choice of a setting or situation."  *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980); *Walker*, 784 F.2d at 50.  Here, ignoring the *scène à faire* doctrine, time and again Plaintiff seeks to rely on common tropes that often appear in stories about down and out sports teams or college life.

(emphasis in original).  By doing so, he lays bare the overarching and fundamental problem with his entire action.  This alleged "unique" similarity exists only at the most abstract level and dissolves once one examines the actual expression of the respective settings in the works.  *See, e.g.*, *Williams*, 84 F.3d at 589 ("Any similarity in the theme of the parties' works relates to the unprotectible idea of a dinosaur zoo.  Once one goes beyond this level of abstraction, the similarity in themes disappears.").[7]

Plaintiff ignores that Hill College is portrayed in *Bucky's 9th* as a run-down school for the deaf located outside Philadelphia on the east coast.  *The Art of Fielding*'s Westish College, in stark contrast, is an archetypical small liberal arts college in an idyllic setting on Lake Michigan in northern Wisconsin, far from the nearest major city.  Nothing about the schools or their settings is the same.  More important, the distinct settings drive the respective plots.  Thus, Hill College's status as a college for the deaf is what necessitates Bucky's deception and complicates his relationship with Julie.  Whereas Westish College's entirely different features – its historical connection to Herman Melville and its location on Lake Michigan – inform multiple plot elements (Guert Affenlight's leaving sports behind for his Melville passion), the name of the baseball team (Harpooners), and Guert's ultimate interment in his beloved lake.  Generally observing that both works exist in the Division III college baseball setting cannot obscure these actual differences.  Opp. at 37.

Instead, Plaintiff's argument, indeed his "central allegation," turns on a belief that he somehow owns the idea of a sports story that takes place in the world of Division III college baseball, because it is "unique."  Opp. at 37.  Of course, Plaintiff slices this pie quite thin as

---

[7] Bizarrely, in his zeal to attack Harbach, Plaintiff cites to an unfavorable review of *The Art of Fielding* which argued that its plot repeats themes found in baseball stories dating back at least as far as the 1940s.  *See* Opp. at 5-6. By doing so, he underscores the very reason his Complaint fails: any similarities between the two works arise out of unprotectible tropes of the sports-story genre.

4823-4743-0745v.7 3910089-000050

indisputably both works fall into an extensive "broader tradition" of sports stories about underdog teams that overcome adversity to succeed, and whose players come of age in the process. *See Porto v. Guirgis*, 659 F. Supp. 2d 597, 611 (S.D.N.Y. 2009) (holding "Judas standing trial" to be unprotectible idea in part because "there is a broader tradition of fictional trials of historical or famous figures").

Even if Plaintiff were the first person to write a coming-of-age novel set at a Division III baseball program, that would not give him a monopoly over that idea because "[m]ere commonality in subject-matter cannot establish infringement." *Allen*, 739 F. Supp. 2d at 664. Indeed, courts consistently find no substantial similarity even when books share the same unique setting, provided that, as here, they express that setting differently. The Second Circuit's decision in *Williams v. Crichton* illustrates this perfectly. There was no dispute that the novel and film *Jurassic Park* and the plaintiff's *Dinosaur World* novels were both adventure stories set in the arguably unique setting of a present-day dinosaur zoo on an island. The Second Circuit nonetheless affirmed dismissal because the dinosaur-zoo setting (however novel) was an "uncopyrightable concept," and the similarities between the works did not extend past *scènes à faire* which followed from that concept. 84 F.3d at 589; *see also Allen*, 739 F. Supp. 2d at 664-65 (no substantial similarity of setting between two works where each "(1) portrays magical worlds based in Europe, wizard hospitals that treat mental illness, wizard colleges, and secret wizard communities; (2) refers to apprentices who protested their working conditions; and (3) involves travel using magical versions of real world-transportation or special powder"). The same result should apply here.

### B.    The Plots

Reading both works back-to-back, as the law directs, it is readily apparent that they are completely different stories: *Bucky's 9th* is about Bucky's great deception – pretending to be

7

deaf in order to find out what caused his father's suicide, while remaining one step ahead of the villainous Professor Goodnight. *The Art of Fielding* is a complex story about years in the lives of Henry and his friends, and of Henry's struggle to come to grips with, first, his preternatural baseball talents and, then, "Steve Blass Disease," or his crisis of confidence. *See* Mot. at 15-16. However hard Plaintiff strains to describe the purported similarities between the plots of these very different works, it is clear that the similarities here pale in comparison to those in cases that courts have routinely dismissed for lack of substantial similarity. *See* Mot. at 23. Plaintiff attempts to dismiss this established body of law as cases "involv[ing] a handful of generalized plots," Opp. at 43, when in fact they involve similarities far more specific and meaningful than anything Plaintiff alleges here.

In *Reyher v. Children's Television Workshop*, 533 F.2d 89, 89-92 (2d Cir. 1976), for instance, the court found there was no substantial similarity despite what the trial court called an "identical sequence of events." Both works described a lost child who tells strangers his mother is the most beautiful woman in the world. When his mother ultimately turns out to be homely, the strangers are confused – until realizing that beauty is in the eye of the beholder. In *Sheldon Abend*, the court found the film *Disturbia* was not substantially similar to the short story and film *Rear Window* even though "both works tell the story of a male protagonist, confined to his home, who spies on neighbors to stave off boredom and, in so doing, discovers that one of his neighbors is a murderer," and "is himself discovered by the suspected murderer, is attacked by the murderer, and is ultimately vindicated." 748 F. Supp. 2d at 208. And in *DiTocco*, 815 F. Supp. 2d at 670-71, the court found there not to be substantial similarity between two series of novels that "both tell the story of modern-day young heroes who must prevent destruction of the world by forces from Greek mythology," including "a quest to get Zeus his lightning bolt,"

conflicts between the protagonists and the titans Atlas and Kronos, and even scenes featuring "a defeated Kronos who gradually – and quite literally – pieces back together in order to regain control of the world."

Indeed, even the cases Plaintiff cites on this issue only underscore how much his action differs from those in which courts have found substantial similarity.  In *Sheldon v. Metro-Godwyn Pictures Corp.*, 81 F.2d 49 (2d Cir. 1936) (cited in Opp. at 33-34), for example, the court found substantial similarity only after concluding that three separate scenes in the respective works had no meaningful differences whatsoever.  The scenes were so similar that their "dramatic significance . . . is the same, almost to the letter."  *Id*. at 56.  In one scene, for instance, in both works:

> [T]he girl goes to the villain's room as he directs; from the outset he is plainly to be poisoned while they are together. . . . Moreno and Renaul each tries to arouse the girl by the memory of their former love, using among other aphrodisiacs the Gaucho song: each dies while she is there, incidentally of strychnine not arsenic.  In extremis each makes for the telephone and is thwarted by the girl; as he dies, she pours upon him her rage and loathing.  When he is dead, she follows the same ritual to eradicate all traces of her presence, but forgets telltale bits of property.

*Id.* at 55.  The other cases Plaintiff cites suggest a similarly high standard for substantial similarity.[8]  Plaintiff plainly cannot meet that standard here, where the expressive differences between the two novels infuse every scene, including the "beaning scene" on which Plaintiff admits he rests his case.

---

[8] *See Maurizio v. Goldsmith*, 84 F. Supp. 2d 455, 461 (S.D.N.Y.) (27 pages of defendant's novel contained language copied verbatim or nearly-verbatim from plaintiff's drafts), *aff'd*, 230 F.3d 518 (2d Cir. 2000); *Smith v. Little, Brown & Co.*, 245 F. Supp. 451, 459 (S.D.N.Y. 1965) (both novels fictionalized story of female Irish chieftain in almost exactly the same way), *aff'd*, 360 F.2d 928 (2d Cir. 1966); *Malkin v. Dubinsky*, 146 F. Supp. 111, 113 (S.D.N.Y. 1956) (both works contained scene with nearly identical dialogue); *Stodart v. Mut. Film Corp.*, 249 F. 507, 509 (S.D.N.Y. 1917) (defendant's work was "beyond question a direct copy from [plaintiff's] plot almost in its entirety," with only trivial differences), *aff'd*, 249 F. 513 (2d Cir. 1918); *Dam v. Kirke La Shelle Co.*, 166 F. 589, 592 (S.D.N.Y. 1908) (characters in defendant's work "portray or imitate the characters in the copyrighted story, and in addition thereto make use of incidents and situations which apparently give expression to the central theme or purpose of the author."), *aff'd*, 175 F. 902 (2d Cir. 1910).  It also speaks volumes that Plaintiff manages to cite on this issue only one case decided in the last fifty years.

In an attempt to support a similarity in the plots in this case, Plaintiff once again resorts to abstract characterizations of the works, this time adopting clichéd sub-titles for these "plots" such as "Baseball Prodigy-Comes-of-Age Plot," or "Recruiter-Mentor Plot."  Opp. at 16-21.  At no time does he attempt to engage in a side-by-side comparison of what actually occurs in the respective works.  To do so would readily establish how dramatically different the two stories actually are.  By way of example, one need only dissect a few of what Plaintiff considers to be the most critical alleged plot similarities.

*Climactic Baseball Games*.  Although Plaintiff admits that he rests much of his case on his bold assertion that the books' "closest similarities" are the "lockstep progression of events and their uncannily parallel descriptions in the third act of each work," *see* Opp. at 16-18, 21-23, 26-27, he fails to even begin to establish this "lockstep progression."  Indeed, on this motion Harbach demonstrated how the progression of the respective climactic baseball games was anything but "lockstep," and that the drama of the respective championship games shares nothing in common since the events are imbued with the knowledge of radically different motivations and characters.  Mot. at 17-19.  Plaintiff makes no effort to distinguish this reality, instead deriding Harbach's focus on the entirety of the games as a "straw man."  Opp. at 38.  Nor does he dispute that concluding a sports story with a hard-fought game between the protagonist team and their bitter rivals that ends in a remarkable fashion is undeniably a well-worn and unprotectible trope of the sports-story genre.  *See* Mot. at 21.

In an effort to save this basic underpinning to his entire claim, Plaintiff now argues that "the critical similarities are the beaning itself and the circumstances surrounding it."  Opp. at 38.  But even narrowing the comparison to the beaning scenes does not help Plaintiff to establish substantial similarity.  To the contrary, the similarities begin and end with the fact the beaning

10

takes place.  Mot. at 17-18.  To establish context, the notion of ending a sports story with the protagonist getting hit by a pitch at a critical juncture is an unprotectible idea that appears in other works predating *Bucky's 9th*.  *Id*. at 17 n.7.[9]  And many of the details Plaintiff calls "critical similarities," Opp. at 38 – e.g., the fact that the scenes take place with two strikes and two outs in the bottom of the ninth inning of the championship game, the fact that they involve each book's protagonist, or the fact one runner was on base making Henry and Bucky the winning run – are unprotectible elements that flow from the fact sports stories often end with climactic games that turn on unusual events when everything hangs in the balance.  *See* Mot. at 21.  When one disregards these *scènes à faire*, there is simply no substantial similarity left.  Drilling down on the actual at-bat when the "beaning" occurs in each work, the actual expression of these events is radically different.  *Compare* McNamara Decl., Ex. A at 472-76, with *id.*, Ex. B at 147-151.  No overlap in language exists and the differences abound.  Among other things:

    a) Bucky is chosen to pinch hit because he is one of the best players on the Hill College team; Henry pinch hits out of necessity when Owen cannot play after finding out about Guert Affenlight's death.

    b) Bucky feels inner peace as he steps to the plate, but Henry is terrified.

    c) Bucky nearly hits a home run before getting hit by a pitch, but Henry – who has not practiced for a month – does not hit a single pitch and knows that he has no chance of reaching base unless he gets hit by a pitch.

    d) Bucky is intentionally hit with a pitch as retaliation for vandalizing the Alice Deal baseball field earlier in *Bucky's 9th*, but Henry chooses to lean into a pitch that was not intended to hit him.

    e) *Bucky's 9th* interrupts its narrative of Bucky's at-bat, taking the reader to a conversation between Professor Goodnight and Hill College's president about the professor's efforts to destroy the baseball team, a major theme of the book; *The Art of*

---

[9] Plaintiff spends considerable energy seeking to distinguish the other examples cited where a protagonist is "beaned" while at bat at a critical moment in the story.  Opp. at 39-40.  But he misses the controlling point:  the idea of a batter being hit by a pitch at a critical moment in a sports story is an unprotectible idea.  Of course the expression of that idea is different in the examples noted by Harbach, just as the expression of that idea in *Bucky's 9th* is readily different from *The Art of Fielding*.

11

> *Fielding*'s narrative of Henry's at-bat is uninterrupted, and the book has no character similar to the villain Goodnight.
>
> f) The beanings lead to different results.  Bucky does not score and his team loses; Henry scores the winning run, before collapsing and being taken to the hospital.
>
> g) The baseball-game narrative of *Bucky's 9th* continues after Bucky is hit by the pitch through the end of the game; in *The Art of Fielding*, the narrative cuts off at the moment Henry is hit by the pitch, and readers find out how the game ends when Mike later tells Henry about it at the hospital.

Mot. at 16-18.  In short, when one focuses on how this discrete event in the two works is actually expressed – the only controlling issue – it is clear the scenes are dramatically different.

      *Baseball Coming-of-Age Plot.*  Plaintiff also claims that the novels have substantial plot similarity because both follow a "prodigy" whose "career follows the same path of emergence from obscurity, diffident reception at school, eventual acceptance by teammates as the Prodigy leads the team to success, downfall and dramatic redemption."  Opp. at 17.  Even restating his arguments underscores that these "similarities" are only abstract generalities.  On closer inspection this "plot line" is really nothing more than a rehash of Plaintiff's claims about the climactic game.  Mot. at 19 n.11; *see* Opp. at 17 ("[I]t is at the climax of the two novels – and the Prodigy's sacrifice and redemption through his beaning – where the similarities [in this plot line] are at their apogee.").

      Further, beyond both works involving a generic coming-of-age sports story, there are no substantial similarities in the arc of the protagonists' baseball careers.  *See* Mot. at 3-7, 25. Bucky's "career" at Hill College is just a means to the ends of solving the mystery of his father's death and saving Willie's coaching job.  It lasts for only a few weeks, during which he pretends to be deaf, and there is no indication that Bucky "comes of age" beyond overcoming the trauma caused by his father's death.  In contrast, Henry's career at Westish lasts for years, during which time he grows from a skinny, shy, unknown recruit to a leader of the team.  And Henry suffers a

12

real "downfall" – losing his ability to make basic plays, and spending a month away from the team dealing with severe depression, or "Steve Blass Disease" in baseball parlance.  There is no parallel to any of that – the turning point of Henry's career at Westish – in *Bucky's 9th*.

      *Illicit-Romance Plot*.  Plaintiff's willingness to stretch and contort the actual works beyond recognition is on full display in his efforts to equate the two novels' romance subplots.  Beyond the fact that both works include romantic relationships between a professor or administrator and a student – which is both an unprotectible idea and a *scènes à faire* of stories about college life, Mot. at 21-22 – the actual romantic plot lines differ dramatically.  In *Bucky's 9th*, it is an opposite-sex relationship between two people of similar age that ends happily; in *The Art of Fielding*, it is a same-sex relationship with a four-decade age difference that seems doomed from the start and ends with a character's premature death.  *See* Mot. at 19-20.  Drilling down, Guert's passion for Owen and their respective rich and detailed back-stories informing the drama and tension of their affair finds no comparison in the traditional girl-meets-boy, falls in love, and lives happily ever after of the Bucky and Julia story.  There is no substantial similarity between those two storylines.

      Plaintiff's only response is to claim that both relationships are "illicit" because Julie and Guert are each prohibited from dating students.  Opp. at 41.  Not only is this element unprotectible because it flows directly from the idea of a faculty-student relationship, the works express the "illicit" nature of the relationship in entirely different ways.  While Julie and Bucky seem unperturbed by the rules against their relationship and make no real effort to hide it, the need to hide their relationship is central to the critical tension in Guert's relationship with Owen, and Guert's attempt to address Owen's distress over the need for secrecy ultimately leads to Guert's downfall.  *See* Mot. at 19-20.

13

Plaintiff then veers dramatically off course when he argues that the "revelation of the scandal" involves the same events at the same points in the stories, citing five events. Opp. at 19. Yet, in Plaintiff's abstract re-telling, he just skips over the critical distinction that the "scandal" being revealed in *Bucky's 9th* is that Bucky is not deaf, not from Texas, and is on the team as a ringer to save Willie's coaching job; whereas, the "scandal" revealed in *The Art of Fielding* is the college President's homosexual affair with a student, 40 years his junior. The "scandal" in *Bucky's 9th* has nothing to do with Bucky's far-from-"illicit" affair with Julie, his contemporary.

*Intergenerational plot*. Plaintiff does not dispute that the basic premise of what he calls the intergenerational plot – "a long-running estrangement" between a father mixed up in scandal and his adult child, Compl. ¶ 30 – is an unprotectible idea. And, once again, the similarities between this plot line disappear when they are examined in any detail. Thus, Plaintiff ignores that, beyond both having played quarterback at some point in their lives, Guert Affenlight bears not the slightest resemblance to Orville Bucks, the father in *Bucky's 9th*; nor do Bucky and Pella Affenlight share any possible trait or backstory. Instead, Plaintiff's argument hinges on his assertion that both fathers die in "similar" circumstances and that their children take "similar" steps to cover up their deaths. Opp. at 41-43. Yet again, Plaintiff just ignores that one death is by a self-inflicted gunshot and the other the result of a heart attack, and that in one story the son overtly rearranges the death scene and the other involves the daughter and her friends digging up a grave to inter the father in a lake. In other words, while *Bucky's 9th* is clear that Orville Bucks committed suicide and that Bucky covered it up, *see* McNamara Decl., Ex. B at 152, neither of those elements are present in *The Art of Fielding*.

*First*, there is no support in *The Art of Fielding* for Plaintiff's claim that Guert Affenlight killed himself. Plaintiff's argument here, as elsewhere, relies on cherry-picked quotations from the book taken out of context. Although Plaintiff quotes a passage from *The Art of Fielding* in which Pella begins to wonder whether Guert may have committed suicide, Opp. at 42, he fails to mention that Pella immediately concludes that "it just wasn't possible . . . he couldn't have killed himself." McNamara Decl., Ex. A at 486-87. She never again wonders whether her father may have committed suicide.

*Second*, while it is clear from *Bucky's 9th* that Bucky tampered with the scene of his father's death in order to cover up his suicide, McNamara Decl., Ex. B at 152, there is no suggestion in *The Art of Fielding* that Pella and her friends move Guert's body to cover anything up. In fact, the book explicitly says that they move Guert's body because he "belonged out there in the water, which he loved," rather than at Westish College, which Pella believed had treated him unfairly by forcing him to resign and falsely suggesting he committed suicide. McNamara Decl., Ex. A at 489. [10] In addition, the friends' act of moving his body is portrayed as a warm and nostalgic bonding experience bearing no resemblance to Bucky's traumatizing cover-up.

*Recruiter-Mentor Plot.* On this motion, Harbach demonstrated that there is no protectible similarity between the Bucky-Willie relationship in *Bucky's 9th* and the Henry-Mike relationship with *The Art of Fielding*. Mot. at 19, 25-26. Plaintiff does not dispute these countless distinctions in his Opposition, instead blithely repeating trivial similarities between the two, Opp.

---

[10] Plaintiff argues that Pella must be responding to the suicide allegations because she resolves to inter Guert in the lake after Dean Melkin suggests he had committed suicide. Opp. at 43. But the book is actually clear that she makes her decision not because she thinks Melkin's allegations are plausible or wishes to obstruct a (non-existent) investigation into Guert's death, but precisely because Melkin's suspicions demonstrate that he and other Westish administrators do not really know her father at all – so that "*they*, the Melkins and Gibbses of the world, could think he was here, while she would know the truth." McNamara Decl., Ex. A at 489.

at 18, many of which – such as Plaintiff's claim that both Mike and Willie were each the "ward of an aunt" – are simply inaccurate.  Mot. at 19 n.12.

Revealing how far he will stretch to construct a similarity, Plaintiff nonetheless argues that "there is no denying that Mike and Willie recruited the Prodigy in the respective works under similar circumstances."  Opp. at 40.  However, the circumstances of the respective recruitments actually differ dramatically.  Mike's serendipitous encounter with Henry on a baseball field outside Peoria, Illinois is presented as such a happy event that that Mike continues to watch video of it years later.  Willie's contrived recruitment of Bucky at a Philadelphia carnival, on the other hand, is described in *Bucky's 9th* as pre-meditated and sleazy.  The respective recruitments epitomize opposite images of baseball talent: Henry is practicing purely for the sake of practice, desperately trying to hold on to his baseball career before he expects it to end in the fall; Bucky is using his baseball talent to hustle a carnival game, and Willie is looking for a ringer for his team.  All that remains, then, is that both books depict the protagonist being recruited while – to use Plaintiff's general phrase – "demonstrat[ing] his preternatural skill with a ball."  *See* Compl., App. at 3; Opp. at 7.  This is clearly not copyrightable.  Not only is that an abstract idea, but it is entirely predictable that a baseball player would be recruited based on his "skill with a ball."

Nor is there any remote similarity on the mentorship side of this plot-line.  On this motion, Harbach established that, while Mike takes a genuine if obsessive interest in Henry's development as a baseball player and a young man, Willie is mostly interested in Bucky to save his job.  Mot. at 19.  Although Plaintiff responds that "there are many instances of Willie mentoring Bucky," he provides not a single example, because none exist.  Opp. at 40; Mot. at 19. There is accordingly no protectible similarity in the works' expression of the basic idea of a

16

recruiter-mentor relationship.  Indeed, as noted before on this motion, a recruiter-mentor relationship is such a *scène à faire* of sports stories that it has even been parodied in films like *Happy Gilmore*.  Mot at 21.

### C.    The Characters

Plaintiff offers no meaningful rebuttal to Harbach's in-depth analysis of the stark differences between the characters in the two works.  Mot. at 24-27.  Instead, he argues that he has demonstrated substantial similarity because copyright law only "requires that there are 'sufficiently delineated' characters who have common traits."  Opp. at 45.  But he seems to have created this "common traits" test out of whole cloth – it certainly does not appear in any of the case law.[11]  In fact, "[t]he bar for substantial similarity in a character is set quite high."  *Sheldon Abend*, 748 F. Supp. 2d at 208.  And, in light of the pervasive differences between all of the main characters, Plaintiff cannot explain how the "high" bar for substantial similarity can possibly be met here.  *See id.* at 208-09 (citing *Arden v. Columbia Pictures Indus., Inc.*, 908 F. Supp. 1248, 1261 (S.D.N.Y. 1995), and *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999)) (noting that courts have rejected substantial similarity in protagonists who "were both self-centered bachelors in their mid-thirties who pursued love interests and became trapped in a repeating day," or where the protagonists "were both half-human, half-vampires named Nicholas Gaunt [who] were both young white males with pale skin, a medium build, dark, tired eyes, and dark, scraggly hair; both sought to learn the truth about their origins; both learned about their origins through flashbacks or memories; both faced the choice of pursuing good or evil; and both were indoctrinated into the forces of evil.").

---

[11] The case Plaintiff mistakenly cites on this point, *Penguin Random House, LLC v. Colting*, states that copyright law protects "characters who are sufficiently delineated to be original."  --- F. Supp. 3d ---, 2017 WL 3977000, at *5 (S.D.N.Y. Sept. 7, 2017).  But the issue here is not whether characters like Bucky and Willie are copyrightable – it is whether characters in *The Art of Fielding* are substantially similar to characters in *Bucky's 9th*.  *Colting* never suggests that a plaintiff can satisfy the substantial similarity requirement merely by showing some "common traits."

Plaintiff also never addresses how the characters here can be substantially similar when even he cannot decide who is who, as his argument relies on mixing and matching purported similarities to compare each character in *Bucky's 9th* with a hodgepodge of different characters in *The Art of Fielding*, and vice versa.  Mot. at 26-27; *see Crane v. Poetic Prods. Ltd.*, 593 F. Supp. 2d 585, 594 (S.D.N.Y. 2009) (allegedly-infringing play's "use of a common metaphor to depict the hopes and actions of a *different* character can hardly be described as substantially similar to [book's] use of that phrase"), *aff'd*, 351 F. App'x 516 (2d Cir. 2009).  Plaintiff does not, and cannot, cite a single case where a court has held there to be substantial similarity in these circumstances.

### D.     Themes

Plaintiff's Opposition also cannot avoid the fact that the central themes of *Bucky's 9th* – Bucky's attempts to deceive those around him at Hill College, and his efforts to make peace with his father's sins – simply do not appear in *The Art of Fielding*.  And the key theme of *The Art of Fielding* – Henry's battle with the crisis of confidence that robs him of his preternatural talent, and drives him away from the baseball team and his best friend Mike – is nowhere to be found in *Bucky's 9th*.  *See* Mot. at 15-16, 29.  Instead, Plaintiff attempts to construct three common themes.

The first two "themes" cited by Plaintiff, which he brands "David and Goliath" and "The Little Engine That Could," Opp. at 24-25, are simply different ways of saying that both novels involve underdog sports teams that unexpectedly succeed against their powerhouse rivals.  But Plaintiff does not deny that this is a universal theme of sports stories, *see* Mot. at 21, which means it is unprotectible.  And he cannot explain how the expression of these themes in the respective novels is substantially similar, beyond pointing to a variety of details like the protagonist teams' "desperation and perseverance," their growing confidence, and their rivals'

18

arrogant fans and superior infrastructure, Opp., App. 3 at 1-5 – all of which are *scènes à faire* that follow directly from the unprotectible idea of an underdog sports team that succeeds against the odds.  Plaintiffs' discussion of these themes also neglects to mention the most important point – the teams' "David and Goliath" battles end completely differently, with Westish winning the national championship and Hill College failing even to win its league after it loses the championship game.

The third theme cited by Plaintiff, that of "Christ-like resurrection and self-sacrifice," Opp. at 26-27, is simply bizarre.  This just appears to be another excuse for Plaintiff to harp on the fact that the climactic game in both books ends with the protagonist getting hit by a pitch.  Aside from passing descriptions of the protagonist as a "savior" or "messiah" – terms often used in sports to describe heralded recruits – neither work contains significant religious imagery, much less any suggestion that "[b]oth authors transform their characters into the Christ."  *Id*. at 27.  And notwithstanding Plaintiff's insistence to the contrary, *id*. at 26, getting hit by the pitch does not suddenly "redeem" either Bucky or Henry.  Bucky actually experiences his "redemption" by accepting his father's legacy *before* getting hit by the pitch.  McNamara Decl., Ex. B at 147.  And *The Art of Fielding* makes clear that Henry's recovery from depression and rapprochement with Mike is a much more gradual process that begins when Henry rejoins the team at the beginning of the championship game and continues through the end of the book.  *See, e.g.*, McNamara Decl., Ex. A at 496.

### E.      Total Concept and Feel

Plaintiff's argument on "total concept and feel" largely just repeats his arguments on other elements of the substantial similarity test.  *See* Opp. at 27-28.  But he cannot obscure the reality that these are two very different novels.  For the reasons discussed above, the works are

not similar in terms of total concept and feel because it is evident on close inspection that there is simply no substantial similarity in the works' plot, characters, setting, or themes.

Further, when courts look at "total concept and feel," they consider the style, pacing, and sequencing of the works. *See* Mot. at 29-32.  Plaintiff does not dispute that the works differ stylistically, with *The Art of Fielding* being told in third person from the perspective of a variety of characters and *Bucky's 9th* mostly being told in first person from Bucky's perspective.  Nor does he dispute that the works differ in pacing and scope. *The Art of Fielding* is, for one thing, a much longer and more intricate work – with deeper characters and better-developed subplots – than *Bucky's 9th*. *See Allen*, 739 F. Supp. 2d at 657 ("As an initial matter, the dramatic difference in length between *Goblet of Fire* and *Livid Land* – 734 pages and 16 pages of text, respectively – immediately undermines Allen's suggestion that the authors similarly 'selected, coordinated and arranged the elements' of their work.").  And, while the narrative in *The Art of Fielding* is spread out over about three years, the main plot in *Bucky's 9th* takes place over about three *weeks*. *See Sheldon Abend*, 748 F. Supp. 2d at 210 (no substantial similarity where "[t]he pace of the two works is dramatically different: the Short Story takes place in just four days, while *Disturbia* spans more than a year and the main action takes place over an indeterminate period of days or weeks").

Plaintiff's only response is to suggest that "the parallel sequencing in the third act" creates substantial similarity between the works. Opp. at 45.  But, as shown on this motion, the sequencing of unprotectible elements can only give rise to substantial similarity where it is "overwhelming" and results in an "enormous amount of sameness." *CBS Broad. v. ABC, Inc.*, 2003 U.S. Dist. LEXIS 20258, at *15 (S.D.N.Y. Jan. 14, 2003); *Boisson v. Banian, Ltd.*, 273 F.3d 262, 274 (2d Cir. 2001); *see* Mot. at 30.  Because this argument relies on the same flawed

4823-4743-0745v.7 3910089-000050

assertion as the rest of Plaintiff's case – that the books have identical climax scenes – it fails. There is simply no meaningful "parallel sequencing" in the two works, even in their third acts, where the sequencing and details of the "beaning" scenes alone differ significantly.

     **F.**     **No Verbatim Copying**

     Plaintiff also halfheartedly suggests that Harbach copied his work verbatim, referring to "shared phrasing" and "uncannily specific duplications in word-use." Opp. at 27 n.8; Compl. App. at 1. But to look at Plaintiff's list of purported textual similarities, Opp., App. 4 at 4-7, is to see its absurdity. All he manages to identify are random words and short phrases – things like a description of music "drifting" through the air, the word "confetti" to describe a character's destruction of a newspaper, and the phrase "for the first time in a decade" to describe each team experiencing success that it had not experienced in at least ten years – that are clearly not protectible. *See Arica Inst. Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992) ("'[T]he ordinary phrase may be quoted without fear of infringement.'") (quoting *Salinger v. Random House, Inc.*, 811 F.2d 90, 98 (2d Cir. 1987) (internal quotation marks omitted); *Nobile*, 2017 WL 4679464, at *8 (defendant's use of four-word phrase appearing in plaintiff's work "fails to provide a sufficient rationale for why this Court should consider this a case of 'verbatim' copying"); *Starobin v. King*, 137 F. Supp. 2d 93, 96-97 (N.D.N.Y. 2001) ("[I]solated words that appear in both works . . . simply not do not contain any evidence of plagiarism of any expression of an idea or fact which is protectible under copyright law.").

     Plaintiff also argues that "[s]everal examples of tent-pole passages, which have identical cadence, tone, pacing, structure, imagery, characterization, and redacted content . . . are so alike that an editor could easily cut and paste from one book into the other without a discerning or ordinary reader ever noticing the difference." Opp. at 28. But this argument falls apart when one looks at the actual passages on which Plaintiff relies.

Plaintiff cites, for instance, portions of each book depicting Willie and Mike respectively recognizing their teams' newfound confidence.  Opp., App. 4 at 1.  But even these passages that Plaintiff has cherry-picked from the novels express the generic idea of an underdog team building confidence in very different ways.  The passage from *Bucky's 9th* occurs midway through the championship game as Hill College has unexpectedly outplayed the heavy favorite. Buoyed by their good play, the team is suddenly brimming with confidence, following the lead of one player, Tischler.  Willie, still thinking about his potential legal problems, is finally able to relax: "Since this might be the last baseball game he'd be able to catch for a while, nothing was going to stop him from enjoying it."  McNamara Decl., Ex. B at 140.  The book contrasts this confidence with the attitude of the team's opponent, describing Alice Deal's bench as a "crypt" and its coach "[r]unning his hands through his hair until his fingers were furry."  *Id.*

The passage in *The Art of Fielding* expresses the confidence idea completely differently. The scene is part of a larger narrative in the book – one with no parallel in *Bucky's 9th* – about how Mike gives the team a short pep talk before every game, and how Mike's pep talks compare with Henry's brand of quiet leadership by example.  *See, e.g.*, McNamara Decl., Ex. A at 160-61, 312, 393-94.  Mike quickly realizes that the lackadaisical team he is used to riling up is gone – the players are staring back at him with intensity that matches his own.  And, in contrast to *Bucky's 9th*, this confidence is not inspired by a teammate or by a few good innings on the field, and it is not contrasted with the opponents' feelings, but the players "had found something new inside themselves."  *Id.* at 454.  Mike, much more introspective at this moment than Willie, realizes that the team has outgrown both his and Henry's leadership.  And, while Willie is relaxed as he contemplates his team's confidence, Mike's "mind was everywhere, sleepless and scattered and sentimental."  *Id.*  Mike, of course, does not face legal jeopardy and therefore has

no reason to think that "this might be the last baseball game he'd be able to catch for a while," but he does come up with an appropriate Moby Dick metaphor – another central part of *The Art of Fielding* nowhere to be found in *Bucky's 9th*.

And Plaintiff does not specify where he sees "identical cadence, tone, [or] pacing" in these passages, but even a cursory read shows that they are stylistically no more similar than one would expect for two passages describing a baseball team's growing confidence.  The alliteration in *The Art of Fielding* ("sleepless and scared and sentimental"), for instance, has no parallel in *Bucky's 9th*.

## III.   PLAINTIFF'S ARGUMENT ON COSTS IS PREMATURE

Finally, Plaintiff's procedural objection to Harbach's request for attorneys' fees, Opp. at 48, is misplaced because Harbach does not ask the Court to decide on the appropriateness of fees at this juncture.  If appropriate, Harbach will bring a formal motion for fees pursuant to 17 U.S.C. § 505 and Fed. R. Civ. P. 54(d) after this Court rules on this motion.  Indeed, Plaintiff's objection to fees turns on the central issue before this Court:  whether the two works are substantially similar.  Plainly, fees may be awarded to the prevailing party, but that party is not yet determined.[12]

## CONCLUSION

As Plaintiff cannot establish substantial similarity between the two works at issue, Harbach respectfully submits that the Court should grant his motion to dismiss the Complaint under Rule 12(b)(6).

---

[12] If this action is dismissed, as we urge the Court, fees are particularly appropriate here where the Plaintiff has repeatedly and unabashedly mischaracterized the works in his Complaint and Opposition and levelled inappropriate personal attacks at Harbach.  Numerous courts have awarded fees in these circumstances.  *See, e.g.*, *Mallery v. NBC Universal, Inc.*, 2008 WL 719218, at *1 (S.D.N.Y. Mar. 18, 2008) (copyright infringement claim objectively unreasonable where "nearly every instance of alleged similarity between [defendant's work] and the plaintiffs' work relates to unprotectable ideas rather than protectable expression"), *aff'd*, 331 F. App'x 821 (2d Cir. 2009); *Muller v. Twentieth Century Fox Film Corp.*, 2011 WL 3678712, at *3 (S.D.N.Y. Aug. 22, 2011) (awarding fees where works "[a]re not actually similar" despite plaintiff's attempts to demonstrate "2000+ similarities").

Dated: New York, New York
　　　January 11, 2018

　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　DAVIS WRIGHT TREMAINE LLP

　　　　　　　　　　　By: /s/ Elizabeth A. McNamara
　　　　　　　　　　　　　Elizabeth A. McNamara
　　　　　　　　　　　　　Adam Lazier
　　　　　　　　　　　1251 Avenue of the Americas, 21st Floor
　　　　　　　　　　　New York, New York  10020
　　　　　　　　　　　Telephone:  (212) 489-8230
　　　　　　　　　　　Facsimile:   (212) 489-8340
　　　　　　　　　　　Email:    lizmcnamara@dwt.com
　　　　　　　　　　　　　　　 adamlazier@dwt.com

　　　　　　　　　　　*Attorneys for Defendant Chad Harbach*

4823-4743-0745v.7 3910089-000050